March 14, 1991

IN THE SUPREME COURT OF THE
COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

ENGRACIA REPEKI, ) APPEAL NO. 90-002
 ) CIVIL ACTION NO. 87-712
 Plaintiff/Appellant, )
 )
 vs. ) OPINION
 )
MAC HOMES (SAIPAN) CO., LTD., )
BALDOMERO NORITA and DELGADINA )
SABLAN, )
 )
 Defendants/Appellee. )
_____)

 Argued and Submitted August 28, 1990

Counsel for Plaintiff/Appellant: William M. Fitzgerald, Esq.
 P.O. Box 909
 Saipan, MP 96950

Counsel for Defendant/Appellee: Charles K. Novo-Gradac, Esq.
 White, Novo-Gradac and Manglona
 P.O. Box 222 CHRB
 Saipan, MP 96950

BEFORE: DELA CRUZ, Chief Justice, VILLAGOMEZ and BORJA, Justices.

DELA CRUZ, Chief Justice:

 The appellant, Engracia Repeki ("Repeki"), obtained a favorable judgment in the Commonwealth Superior Court quieting title to property in Tanapag, Saipan.[1] She appeals that part of

---

[1]Repeki v. MAC Homes (Saipan) Ltd., Civil Action No. 87-712 (N.M.I. Super. Ct. Dec. 21, 1989); see also memorandum decision issued December 12, 1989. The property is Lot 017 B 11.

the judgment granting the appellee, MAC Homes (Saipan) Co., Ltd. ("MAC Homes" or "the company"), a $392,000 lien for the "enhancement value" of a house and other improvements it constructed on the property in the mistaken belief that it held a valid leasehold interest.

We affirm.

I.

MAC Homes, an NMI corporation engaged primarily in real estate development, was established in 1985. It is a subsidiary of a Japanese company owned principally by Kazutoyo Sonobe ("Sonobe"), a resident of Japan. MAC Homes is managed locally by Toshiaki Suzuki ("Suzuki").

In 1986, Sonobe told Anthony Pellegrino ("Pellegrino"), a social acquaintance, that MAC Homes was interested in leasing property on Saipan. Pellegrino then contacted Manuel A. Sablan ("Sablan") to look for property that might interest MAC Homes and orally agreed to split profits and commissions. The two had previously acted together to lease property to others.

Sablan in turn contacted Regino Aquino ("Aquino"), who had a "listing" from Nicanor Norita. Nicanor Norita wished to sell the property at issue in this suit, which was held by his father, Baldomero Norita, as land trustee for the heirs of Maria Norita. Pellegrino, Sablan and Aquino agreed to promote the lease of the property. Pursuant to that understanding, Pellegrino showed the property to Sonobe and Suzuki in April, 1986. At the time of the visit, a family was found to be living on a portion of the

38

property, purportedly with the permission of the owner.[2]

MAC Homes agreed to lease the property on terms Pellegrino suggested--$118,195 for 55 years. Upon Pellegrino's assurance that title was clear and that he would get title insurance, Suzuki paid an earnest money deposit of $20,000 to Nicanor Norita. Subsequently, Pellegrino told Suzuki that it was necessary to immediately pay an additional $30,000 toward the transaction because someone in the owner's family was ill and required money immediately. Upon further assurance by Pellegrino that the title was sound, Suzuki complied, taking a check payable to Baldomero Norita to Sablan's office.

On June 5, 1986, Baldomero Norita quitclaimed the _entire_ property to Delgadina Sablan, Sablan's wife, for $50,000.

Despite this conveyance, on July 23, 1986, Baldomero Norita entered into an agreement which, inter alia, purports to "quitclaim" a portion of the property to a member of the family that had been living there.

Delgadina Sablan obtained an insurance policy insuring her title on July 28, 1986. The policy contained an exception to coverage because of Trust Territory High Court records indicating

---

[2]Repeki cites this fact as early notice to MAC Homes of uncertain title, and contends that reasonable prudence dictates that the family should have been questioned to determine who had given them permission to reside on the property. This was not done. However, a subsequently-executed agreement between Baldomero Norita and a member of the family describes the family member as a "relative" who "has, on her own volition and accord and without objection by Baldomero Norita or . . . Nicanor F. Norita, been residing [on] and occupying [a] portion of the [property] for residential and retail business purposes . . . ." "Agreement to Relocate" at 2 (Plaintiff's exhibit 9).

39

that Baldomero Norita's claim to be sole heir of Maria Norita was questionable. MAC Homes was not informed of the contents of this policy. Despite the exception, Pellegrino again assured MAC Homes that title to the property was sound. Suzuki paid the balance of the lease price ($68,195) to Delgadina Sablan on August 2, 1986.

Delgadina Sablan and a representative of MAC Homes entered into a lease agreement[3] on August 2, 1986. The agreement was recorded three days later. On that date--August 5, 1986--MAC Homes obtained an insurance policy insuring its leasehold estate. That policy did not contain the exception to coverage noted in Delgadina Sablan's title insurance policy.

In September, 1986, MAC Homes cleared and fenced the portion of the property that it was leasing.

Around November of 1986, the company was told by a third party (Saipan resident Noriyasu Horiguchi) that Delgadina Sablan had obtained her title from Baldomero Norita for only $50,000--$68,195 less than the sum paid by MAC Homes for the subsequent lease--by means of a "quitclaim deed,"[4] which was said to be unreliable, and that the heirs to the property had not yet been legally determined in a probate proceeding. When Suzuki questioned Pellegrino about the difference between the consideration recited in the deed and

_____

[3]We note that the lease agreement conveyed a leasehold in only 3,377 of an estimated 5,443 square meters in the Tanapag property. Even accounting for the 722 square meters purportedly quitclaimed by Baldomero Norita to the member of the family that was living on the property, 1,344 square meters is unaccounted for. Presumably, this portion was to be retained by Delgadina Sablan.

[4]The trial court ruled that the deed was in fact a warranty deed. Repeki, memorandum decision at 11.

the sum paid for the lease, Pellegrino said that the consideration in the deed had been understated to allow Baldomero Norita to avoid taxes.

Around July of 1987, MAC Homes contracted with Pellegrino to build a residence for Sonobe on the property. Construction commenced the next month.

On November 13, 1987, when construction of the house was approximately eighty percent complete, Repeki filed the present action to quiet title to the property. She claimed that she was Maria Norita's sole surviving child, and thus the true owner. MAC Homes presented several defenses and, in the event that Repeki was determined to be entitled to the property, asserted a claim for equitable reimbursement for the improvements, cross-claimed against Baldomero Norita for damages for breach of warranty and fraudulent representation, and cross-claimed against the other defendants.

Two months after the suit was filed, the Sonobe residence was completed at a cost of $635,000.

## II.

The Superior Court ruled that the property was owned by the heirs of Maria Norita[5] and that MAC Homes had no leasehold interest, but granted the company a lien for $392,000 for the

_____

[5]Evidence adduced at trial indicated that Baldomero Norita was Maria Norita's brother--thus, his claim to the estate was subordinate to Repeki's claim. In its decision, the trial court noted that the title holders to the property will be determined in In re Estate of Limau, Civil Action No. 88-724, a probate that was commenced after the complaint was filed in this action, This probate has not yet been concluded.

41

"enhancement value" of its improvements. The court also held that Delgadina Sablan owed MAC Homes compensation for the lease price ($118,195), attorney's fees and costs.[6] No relief was granted on MAC Homes' cross-claims against the other defendants.

## A. COMPENSATION FOR IMPROVEMENT

Noting that the CNMI has no "betterment" statute concerning compensation for improvements to property, the trial court applied the equitable doctrine that one who (in good faith) mistakenly places improvements on the property of another is entitled to compensation, the measure being the amount by which the improver has enhanced the value of the property.[7] It considered two arguments made by Repeki to the effect that MAC Homes lacked the requisite good faith.

## 1. The Asserted Agency Relationship

Repeki's first argument concerning MAC Homes' purported lack of good faith centered on the relationship between the company and Pellegrino, Sablan and Aquino. Repeki contended that the three

---

[6]The court held that MAC Homes was entitled to relief from Sablan because she warranted title and quiet enjoyment in a lease provision. Repeki, memorandum decision at 13. When it rendered judgment the court authorized attorney's fees and costs of $25,361.08. Due to the fact that Baldomero Norita died before trial commenced and no probate of his estate was pending, the court declined to grant MAC Homes relief against him.

[7]Neither party contests the applicability of the doctrine per se in this case, but Repeki disputes the trial court's analysis and conclusions with respect to MAC Homes' good faith and the measure of recovery. As noted infra, the trial court did not fully set forth the applicable standard of compensation, but nonetheless reached the correct result.

were agents of MAC Homes, and that their knowledge (or the fact that they should have known) of the questionable nature of Baldomero Norita's title to the property should be imputed to MAC Homes under agency principles, negating the company's claim of good faith.

At trial, Pellegrino testified that he, Sablan and Aquino had not informed MAC Homes of the true cost of the land ($50,000); that they had not informed Nicanor Norita of the lease amount subsequently paid by MAC Homes ($118,195); and that they had taken the difference ($68,195) for themselves.

Based on this and other evidence, the trial court ruled that there was no agency relationship. It cited several factors, including Pellegrino, Sablan and Aquino's lack of: (1) an agency contract, (2) employment by the company, and (3) authority to bind MAC Homes, as well as (4) actions which appeared to have been dictated by their own interest. "As a very practical matter, the triad was working for no one but themselves." Repeki, memorandum decision at 9. According to the court, the fact that their commissions came from money expended by MAC Homes did not mean that the company employed the three. "It is common for the seller's broker to receive his commission out of the proceeds of the sale which are supplied by the buyer. This does not make the broker the buyer's agent." Id.

Further, Pellegrino, Sablan and Aquino's failure to notify MAC Homes of the possibility that the property could be leased at a much lower rate indicated that they were actually acting adversely

43

to the company's interest:

> Even if it could be construed that Pellegrino and Manuel Sablan were agents of Mac Homes, it is clear that they were acting adversely to the interests of Mac Homes. In such a case, any knowledge of the agent is not imparted to the principal.

Id.

## 2. The Asserted Reasonable Notice

Repeki claimed in the alternative that (even in the absence of imputed knowledge under agency principles) MAC Homes lacked the requisite good faith because it was put on reasonable notice of the faulty title prior to the construction of the home. Among the evidence cited for this proposition was the information MAC Homes received from the third party, Horiguchi, in November of 1986 concerning the apparent lack of a warranty deed conveying the property to Delgadina Sablan, the discrepancy between the deed consideration and the sum paid for the lease, and the absence of a probate of Maria Norita's estate.

The court ruled that this evidence did not negate the company's good faith because: (1) the deed was actually a warranty deed, (2) MAC Homes possessed a leasehold insurance policy, and (3) the MAC Homes representatives were inexperienced in Saipan real estate transactions. Repeki, memorandum decision at 11. According to the court:

> Under all the circumstances the court cannot find the defendant proceeded in bad faith. Mac Homes may have indulged in blind faith in the trust and confidence placed in Pellegrino but this does not negate good faith.

Id.

44

Finally, the court found it significant that Repeki and the other heirs failed to notify MAC Homes of the title problems when construction started:

> Had the lawsuit been filed prior to construction and before the materials were ordered, the defendant would have little to complain about except for the activities of Pellegrino and Manuel Sablan. Good faith by Mac Homes is only part of the story. Diligence and action by the owners of the property is also required. They cannot idly stand by and watch a massive structure being constructed on their property and then claim lack of good faith by the improver and object to the construction of an unwanted residence.

Repeki, memorandum decision at 12.

## B. THE REMEDY

The $392,000 lien that the trial court awarded MAC Homes was based on the company's appraisal of the house and property for $1,000,000: $608,000 for the land, $392,000 for the enhancement. Repeki did not counter this appraisal with her own appraisal.[8]

Asserting that the house constructed by MAC Homes frustrated the development or sale of the property with condominium units (which MAC Homes' appraiser agreed to be the most economically rewarding—"highest and best"—use), Repeki contended that the value of the property was thus not enhanced and that MAC Homes should not be reimbursed for the improvement. The trial court rejected this argument.

---

[8]The trial court viewed the property and accepted MAC Homes' appraisal. Repeki, memorandum decision at 13. Also uncontradicted was MAC Homes' claim that the Sonobe residence was constructed at a cost of $635,000. As noted infra, the cost figure and the enhancement figure must both be scrutinized in assessing a grant of compensation to a good faith improver.

45

"This attack is repelled because the plaintiff sat by and did not timely inform Mac Homes of her interest and allowed a single family residence to be substantially completed before filing suit." *Repeki*, memorandum decision at 12. The court also observed that a "highest and best use" factor is not part of the enhancement formula because:

> Foresight could defeat an otherwise valid equitable claim for compensation. In any appraisal, the nature of the improvement is an essential element at arriving at the enhancement figure. Thus, if Mac Homes had built a condominium (which the plaintiff now apparently professes to want) the plaintiff would probably have to pay Mac Homes a greater amount than what is indicated for a single family residence.

*Id.*

## III.

The central issue in this appeal is whether MAC Homes satisfies the good faith requirement of the doctrine of equitable compensation for the residence it constructed on the Tanapag property. Though repeating many of the arguments she raised at trial, Repeki now contends that only Pellegrino was MAC Homes' agent, and that his duty as agent was limited to an investigation of the ownership of the property. She also asserts that she gave notice of her adverse claim to Manuel Sablan before MAC Homes commenced construction of the Sonobe residence.

The trial court correctly noted that there is no NMI "betterment" statute permitting reimbursement for improvements constructed in good faith on the property of another by mistake. Since there is also no local customary law on point, the applicable

46

law is provided in the <u>Restatement of Restitution</u> (1937):[9]

>	Except to the extent that the rule is changed by statute, a person who, in the mistaken belief that he or a third person on whose account he acts is the owner, has caused improvements to be made upon the land of another, is not thereby entitled to restitution from the owner for the value of such improvements; <u>but if his mistake was reasonable, the owner is entitled to obtain judgment in an equitable proceeding or in an action of trespass or other action for the mesne profits only on condition that he makes restitution to the extent that the land has been increased in value by such improvements or for the value of the labor and materials employed in making such improvements, whichever is least.</u>

<u>Id</u>. § 42(1) (emphasis added).[10] The emphasized language essentially embodies the equitable doctrine affording compensation to an improver who (1) is in possession of property adverse to the true owner under (2) color or claim of title and who (3) constructs improvements in good faith. <u>See</u> <u>Smith v. Long</u>, 281 P.2d 483 (Idaho 1955).

██Inequitable conduct by a landowner is not a prerequisite to a good faith improver's right to compensation. Under circumstances in which a landowner would be unjustly enriched by retaining improvements mistakenly constructed upon the property by a good faith improver, the improver is entitled to compensation "even though [the landowner is] free from any inequitable conduct in

---

[9]Applicable pursuant to 7 CMC § 3401, which dictates that U.S. common law as expressed in the Restatements "shall be the rules of decision" in the absence of NMI written law or local customary law to the contrary.

[10]According to the reporters' notes to this section, "[i]f the owner of land seeks equitable relief, <u>as where he seeks to quiet title</u>, ordinarily relief is granted only on condition that he make payment for the improvement of the land by respondent: [citations omitted]." (Emphasis added).

47

connection with the construction of the [improvement] upon his land . . . ." Somerville v. Jacobs, 170 S.E.2d 805, 810 (W. Va. 1969).[11] In addition:

> Where a person is entitled to restitution from another because the other, without tortious conduct, has received a benefit, the measure of recovery for the benefit thus received is the value of what was received, limited, if the recipient was not at fault or was no more at fault than the claimant, to its value in advancing the purposes of the recipient . . . .

Restatement of Restitution § 155 (emphasis added).[12]

MAC Homes clearly fulfills the first two criteria of the doctrine of compensation. Smith, supra. The company's apparently valid leasehold based on Delgadina Sablan's deed satisfies the

_____

[11]See also Annotation, Action to Recover Improvements Made on Land, Taxes or Interest Paid, or Lien Discharged, by One Who Mistakenly Believed Himself the Owner, 104 A.L.R. 577 (1936) (growing trend to permit recovery even in absence of inequitable conduct on part of owner when circumstances render relief just and equitable).

[12]According to official commentary to this section:

> In two types of situations a person may be required to pay for services which he has not requested and for the receipt of which he is not at fault. First, if because of an innocent mistake, improvements have been made upon his land by the improver and he seeks the aid of equity against the improver, he must pay for the increased market value of the land due to the improvements (see § 42). Secondly, restitution may be granted to one for services which constitute the performance of another's duty or which are rendered in an emergency in the protection of another's life or property . . . . In all such cases the limit of restitution is the amount by which the recipient or his property has benefited, although the value of the services or the amount which was expended therefor may be greater.

Restatement of Restitution, comment d (emphasis added). The emphasized language draws a distinction not explicitly addressed by the trial court, which we examine infra.

48

"color or claim of title" requirement,[13] and MAC Homes' occupancy of the Tanapag property was certainly adverse to the true owners. Our decision hinges upon analysis of the third criteria, the requirement of good faith.

## IV.

Was Pellegrino MAC Homes' agent for the limited purpose of investigating the ownership of the Tanapag property?

We analyze the existence of an agency relationship with reference to the Restatements.[14] According to the Restatement (Second) of Agency (1958):

> (1) Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.

> (2) The one to whom action is to be taken is the principal.

> (3) The one who is to act is the agent.

Id. § 1. There are three essential characteristics of an agency relationship. First, "[a]n agent or apparent agent holds a power to alter the legal relations between the principal and third persons and between the principal and himself." Id. § 12. Second, "[a]n agent is a fiduciary with respect to matters within the scope

---

[13]"A writing which professes to pass title on its face but which does not do so either due to lack of title in the person making it or from some type of defective conveyance may constitute 'color of title.'" Munkres v. Chatmon, 599 P.2d 314, 316 (Kan. Ct. App. 1979).

[14]This is necessary because there is neither NMI written law nor local customary law on point to resolve this issue. 7 CMC § 3401.

49

of his agency." Id. § 13. Third, "[a] principal has the right to control the conduct of the agent with respect to matters entrusted to him." Id. § 14.

█ If an agency relationship is established, the agent's knowledge can be imputed to the principal:

> Except where the agent is acting adversely to the principal or where knowledge as distinguished from reason to know is important, the principal is affected by the knowledge which an agent has a duty to disclose to the principal or to another agent of the principal to the same extent as if the principal had the information.

Restatement (Second) of Agency § 275 (1958).[15] Repeki cites official commentary to this provision to support her contention that MAC Homes should be charged with imputed notice of faulty title based on Pellegrino's investigation:

> P employs A, a real estate broker, to make preliminary negotiations and to investigate the title of land which P is considering purchasing and to report as to the existence of any recorded interests in the property. A, knowing of such an interest, negligently fails to report it to P. P takes the land subject to the unrecorded interest.

Comment a, illustration 1.[16]

█ The existence of an agency relationship is generally a question of fact to be determined by the trier of fact. 3 C.J.S.

---

[15]See also Restatement (Second) of Agency §§ 9(3), 272.

[16]Repeki also cites official commentary to Id. § 272:

> A is employed by P to report upon the title to Blackacre and to tell him of any secret equities which he may discover. A discovers that T has an equity in Blackacre, but negligently fails to report this to P, who accordingly buys Blackacre from B. P is affected by A's knowledge.

Comment c, illustration 4.

Agency § 547 (1972). However, "[w]hether . . . an agency relationship exists is a question of law for the court where the material facts from which it is to be inferred are not in dispute." Warren v. Mangels Realty, 533 P.2d 78, 81 (Ariz. Ct. App. 1975); see also Butler v. Colorado International Pancakes, Inc., 510 P.2d 443 (Colo. Ct. App. 1973).

The material facts from which Repeki urges that an agency relationship can be inferred were not in dispute. Accordingly, this issue presents a question of law which we review de novo. In re Estate of Rofag, No. 89-019 (N.M.I. Feb. 22, 1991).

We conclude that there is insufficient evidence in the record to establish an agency relationship between MAC Homes and Pellegrino--even for the limited purpose argued in this appeal. As the trial court noted, Pellegrino had no authority to bind the company, negating the "holder of power" attribute specified in Restatement (Second) of Agency § 12. The evidence indicates that Pellegrino and his associates were acting for themselves--that they were not subject to any right of control by MAC Homes. Cf. Id. § 14.[17] Pellegrino owed no fiduciary duty to MAC Homes. His knowledge thus cannot be imputed to MAC Homes under agency principles. See Warren, supra (since real estate broker was not

---

[17]"[A] prerequisite of an agency relationship is control of the agent by the principal." Moss v. Vadman, 463 P.2d 159, 164 (Wash. 1970). In this case, without breaching any duty to MAC Homes Pellegrino could have decided, at any time, not to investigate ownership of the Tanapag property or to look for other land for the company. Instead, the record indicates that he voluntarily undertook to perform these tasks because it was in his interest to do so.

51

agent of prospective purchaser, no fiduciary relationship existed). We accordingly decline to reverse on this basis.

## V.

In the absence of an agency relationship, we now examine whether there was sufficient evidence for the trial court to conclude that MAC Homes' reliance on an apparently valid leasehold was made in good faith.

According to 42 C.J.S. Improvements (1944):

> Good faith . . . depends on the circumstances of the particular case in which it is asserted; but stated generally it must be an honest belief on the part of the occupant that he has secured a good title to the property in question, and that there are no adverse claims; and for this belief there must be reasonable grounds that would lead a [person] of ordinary prudence to entertain it.

Id. § 7. "In its traditional sense good faith connotes a moral quality; it is equated with honesty of purpose, freedom from fraudulent intent and faithfulness to duty or obligation." Raab v. Casper, 124 Cal.Rptr. 590, 593 (Cal. App. 1975). Negligence--lack of care--is not an element of good faith unless it is specified as an element in a "betterment" statute. Id.

"It is usually a question of fact . . . whether or not an occupant has made improvements in good faith while in bona fide possession under color of title . . . ." 42 C.J.S. Improvements § 14 (1944). However, as with the question of the existence of an agency relationship, if the evidence is undisputed, the question is one of law to be determined by the court. Brown v. Fisher, 193 S.W. 357 (Tex. Civ. App. 1917). We believe that the evidence

concerning this issue is essentially undisputed. Thus, as a question of law, it is subject to de novo review. In re Estate of Rofag, supra.

Repeki raises two contentions to refute the trial court's conclusion with respect to the company's good faith. First, when MAC Homes began to erect a fence on the Tanapag property soon after the lease was executed, Repeki asserts that she notified Manuel Sablan that the property rightfully belonged to her. "Sablan [then] informed Pellegrino as the representative of MAC Homes about the complaint." Appellant's brief at 2. Second, Repeki argues that MAC Homes was given notice of Delgadina Sablan's unreliable title by the third party, Horiguchi, who informed Suzuki of irregularities in the land transfer and lease transaction before construction commenced on Sonobe's residence.

Neither contention, even if accepted as true, necessarily negates MAC Homes' good faith:

> As a general rule an occupant is regarded as an occupant in bad faith and not entitled to compensation for his improvements, where, and only where, he has either actual notice of the adverse title, or what is equivalent thereto, such as where there is brought home to him notice of some fact or circumstance that would put a [person] of ordinary prudence to such an inquiry as would, if honestly followed, lead to a knowledge of the adverse title.

42 C.J.S. Improvements § 7 (1944).

The record confirms that MAC Homes had no actual notice of Repeki's adverse title prior to substantial completion of the improvement. As noted infra, Pellegrino's knowledge cannot be imputed to the company under agency principles. Likewise, as the

trial court found, Repeki failed to notify MAC Homes of her claim to the Tanapag property prior to the filing of this suit, when the Sonobe residence was eighty percent completed. Repeki, memorandum decision at 11.[18]

The record also confirms that MAC Homes did not have the "equivalent" of actual notice of Repeki's adverse title. Horiguchi's unsolicited remarks do not meet this standard.

We will initially consider Horiguchi's information to the effect that there had been no probate to conclusively settle title to the Tanapag property.

In some circumstances, such information could be a "fact or circumstance that would put a [person] of ordinary prudence to such an inquiry as would, if honestly followed, lead to a knowledge of the adverse title." 42 C.J.S. Improvements § 7 (1944). In this case, however, other facts lead us to conclude that the company's good faith was not negated by its receipt of this information.

First (and most importantly), Horiguchi did not say that the property actually belonged to anyone other than Delgadina Sablan (by way of Baldomero Norita). If Horiguchi told Suzuki that he or another person knew of an adverse claim to the Tanapag property,

---

[18]The record supports this finding. There is some authority for the proposition that even if Repeki had given MAC Homes actual notice of her adverse title prior to the construction of the Sonobe residence, the company's good faith would not necessarily have been negated. "The [improver's] mistake may be one concerning the legal effect of a deed, and notice of the true owner's adverse claim to the realty does not vitiate the improver's entitlement to restitution so long as the improvements were made under a good faith belief of the legitimacy of the improver's claim." Coos County v. State, 734 P.2d 1348, 1363 (Ore. 1987).

54

our conclusion concerning the company's good faith could well be different. However, "in the absence of some information that <u>some particular person</u> knows of an adverse claim to the premises in dispute, there is no duty resting upon the purchaser to make inquiries of such person . . . ."[19] <u>Strong v. Strong</u>, 98 S.W.2d 346, 109 A.L.R. 739, 743 (Tex. 1936) (emphasis added), quoting <u>Bounds v. Little</u> 12 S.W. 1109, 1110 (Tex. 1889). This rule also applies to prospective lessees. <u>Strong</u>, <u>supra</u>.

Further, there is nothing in the record indicating that MAC Homes actually suspected that the Tanapag property was owned by others, or that the company's representatives remained purposely ignorant of facts pointing to ownership by others.[20] <u>Cf</u>. <u>Strong</u>, 98 S.W.2d 346, 109 A.L.R. at 744 (good faith of lessee apparent

---

[19]<u>See also</u> Annotation, <u>Reputation in the Community as to Title to or Interest in Land as Charging One with Notice or Putting Him on Inquiry, as Regards His Status as Innocent Purchaser or Mortgagee</u>, 109 A.L.R. 746 (1937):

> It is well established that vague or general rumors, reports, surmises, covert insinuations, or general assertions, based on hearsay and made by strangers or those not interested in the property, as to the existence of a title or interest in some third person or persons whose title or interest is not recorded, do not constitute notice of title or interest in such third person, or impose upon a purchaser or mortgagee the duty of inquiry.

<u>Id</u>. at 747.

[20]There is no indication in the record that MAC Homes was aware of documents (including a 1953 Trust Territory determination of ownership) vesting title in "the heirs of Maria Norita, represented by Baldomero Norita as land trustee." In fact, the record indicates that at least at the time of trial, these documents were missing from the NMI Land Commission office, where they were ordinarily kept on file. Testimony revealed that it is unclear how long they had been missing.

from record: "there is no evidence of circumstances tending to prove that those who represented Sun Oil Company remained purposely ignorant of facts pointing to ownership by someone other than [the lessor], or that they suspected that there were other owners, or that they attempted to acquire through the aid of the registration laws a title that they did not really believe to be in the lessor").

Second, Horiguchi's assertion that the title conveyance was by a deed devoid of warranties (the "quitclaim deed") was incorrect. The deed warrants (without exception or reservation) that the property is not subject to lien "or encumbered in anyway [sic] and I have good right and title to sell . . . ." This deed was filed in the Commonwealth Recorder's Office.

Third, Horiguchi's information concerning the discrepancy ($68,195) between the lease price and the sale price did not indicate that Baldomero Norita lacked valid title to convey to Delgadina Sablan.

 Fourth, it is significant that MAC Homes' leasehold insurance policy did not specify any unusual exception to coverage with respect to a defect in either Baldomero Norita or Delgadina Sablan's title.[21] The company could reasonably rely upon this policy as evidence of clear title:

> The sole object of title insurance is to cover possibilities of loss through defects that may cloud

---

[21]As noted _infra_, the trial court found that MAC Homes had _not_ been advised of the contents of Delgadina Sablan's title insurance policy, which _did_ contain an exception to coverage based on uncertainty in Baldomero Norita's title.

title. It is not mere guesswork, nor is it a wager. It is designed to be predicated upon careful examination of the muniments of title, an exhaustive study of the applicable law and the exercise of expert contract draftmanship. Some defects will be disclosed by a search of the public transfer records; others will be disclosed only by a physical examination or a survey of the property itself. Often the existence of title defects will depend upon legal doctrines and judicial interpretations of various applicable statutes. Since the average purchaser has neither the skill nor the means to discover or protect himself against the myriad of defects, he must rely upon an institution holding itself out as a title insurer.

United States v. City of Flint, 346 F.Supp. 1282, 1285 (E.D.Mich., S.D. 1972) (emphasis added).

Under the circumstances, there is sufficient evidence to conclude that MAC Homes built the Sonobe residence on the Tanapag property with the requisite good faith.

It is worth emphasizing that "in cases involving the right to recover for improvements placed by mistake upon land owned by one other than the improver, the solution of the questions involved depends largely upon the circumstances and the equities involved in each particular case." Somerville, 170 S.E.2d at 810. Each such case must be assessed in light of its unique facts. Under the circumstances of this case, it would be inequitable for Repeki to retain the Sonobe residence without compensating MAC Homes. "It is as contrary to equity and good conscience for one to retain a house which he has received as the result of a bona fide and reasonable mistake of fact as it is for him to retain money so received." Beacon Homes, Inc. v. Holt, 146 S.E.2d 434, 438 (N.C. 1966).

# VI.

Repeki's contention that the improvement did not actually enhance the value of the Tanapag property also lacks merit.

 The value of improvements made in good faith is usually a question of fact for the trier of fact to determine. 42 C.J.S. Improvements § 14 (1944); see also Beacon Homes, supra. There was sufficient evidence to permit the trial court--sitting as the trier of fact--to find that the improvement enhanced the value of the property.[22]

It is, however, necessary for this Court to elaborate on the applicable standard of compensation.

 It is only partially correct that "[t]he measure of recompense is the amount by which the improver enhanced the value of the property." Repeki, memorandum decision at 7 (citing 41 Am.Jur.2d Improvements § 22 (1968)). There is a significant part of the standard of compensation that was not noted by the trial court. According to the Restatement of Restitution § 42(1), an owner must compensate a good faith improver "to the extent that the land has been increased in value by such improvements or for the value of the labor and materials employed in making such improvements, whichever is least."[23] (Emphasis added.) There is a practical

---

[22]Cf. Sanders v. Jackson, 192 So.2d 654 (La. Ct. App. 1966) (no right of compensation to good faith improver for construction of dam and pond which did not improve the value of the landowner's property).

[23]According to the official commentary to this section, "[w]here the improver is permitted to recover for the improvements, he is entitled to the reasonable value of his labor and materials or to the amount which his improvements have added to the market

58

reason for this distinction:

> [E]nhanced value is usually determined by the difference between the value of the land with and without the improvements at the time of dispossession. In most cases . . . the cost of the improvements exceeds the enhanced value of the land, and the court is concerned lest the improver recoup more than the owner is unjustly enriched. . . . But, cost is usually a factor in determining value, and in some cases is a limitation upon the improver's recovery, as where enhancement exceeds cost, and the court is again concerned lest the improver's recovery exceed the amount of the unjust enrichment to the owner. This is so for the test of recovery is not how much the owner is enriched by the improvements, but how much he is unjustly enriched. And, <u>the owner is not unjustly enriched more than the improver's cost</u>. In short, where enhancement exceeds cost, unjust enrichment equals cost. . . . It was these considerations which undoubtedly led the Restatement to adopt the "whichever is least rule" . . . .

<u>Madrid v. Spears</u>, 250 F.2d 51, 54 (10th Cir. 1957) (emphasis added). <u>See also</u> <u>Larry C. Iverson, Inc. v. Bouma</u>, 639 P.2d 47 (Mont. 1981) (modifying trial court's award because it allowed recovery of value of improvements, rather than cost of improvements, which was lower); <u>Lesny Development Co. v. Kendall</u>, 210 Cal.Rptr. 890 (Cal. App. 1985) (noting distinction).

Though the trial court did not explicitly draw this distinction, it nonetheless granted compensation according to the increase in value ($392,000) of the Tanapag property, which was less than the value of the labor and materials employed in the construction of the improvement ($635,000). This was proper. We accept the trial court's findings on value, which were based on the company's appraisal. As noted above, Repeki did not counter this

---

value of the land, whichever is smaller." Comment <u>c</u>.

59

appraisal with her own appraisal.[24]

The trial court was clearly within its authority in imposing a lien. "There is general agreement upon the proposition that, upon an adjudication that the claimant is entitled to recover compensation, the court may, and ordinarily will, impress upon the premises a lien in his favor to secure the payment thereof." Annotation, Compensation for Improvements Made or Placed on Premises of Another by Mistake, 57 A.L.R.2d 263, 292 (1958); see also Restatement of Restitution § 161; Smith, supra.

## VII.

For the foregoing reasons, the trial court's decision is AFFIRMED.

Entered this 14th day of March, 1991.

_____
JOSE S. DELA CRUZ, Chief Justice

_____
RAMON G. VILLAGOMEZ, Associate Justice

_____
JESUS C. BORJA, Associate Justice

---

[24]We will set aside a finding of fact only if it is clearly erroneous. Com.R.Civ.P. 52(a); In re Estate of Rofag, supra.