SEARIVER MARITIME, INC.,
a Delaware Corporation,
Plaintiff,

v.

INDUSTRIAL MEDICAL SERVICES, INC., a California Corporation; Joel Renbaum, M.D., Inc., a California Corporation, d/b/a, Occupational Health Network; and David A. Smith, M.D., Defendants.

No. C 95–2435 SBA.

United States District Court,
N.D. California.

Jan. 23, 1997.

Marco Quazzo, Christine Banks, McCutchen, Doyle, Brown & Enersen, San Francisco, CA, for Plaintiff.

Charles E. Osthimer, III, Jane E. Lennon, Wright, Robinson, Osthimer & Tatum, San Francisco, CA, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ARMSTRONG, District Judge.

This matter was tried to the Court from September 12, 1996 through September 18, 1996, the Honorable Saundra Brown Armstrong presiding. Plaintiff SeaRiver Maritime, Inc. appeared through its counsel of record, Marco L. Quazzo, and Christine Banks of McCutchen, Doyle, Brown & Enersen. Defendants Industrial Medical Service, Joel Renbaum, d/b/a/ Occupational Health Network, and David A. Smith, M.D. appeared through their counsel of record, Charles E. Osthimer, and Jane Lennon of Wright, Robinson, Osthimer & Tatum.

Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following findings of fact and reaches the following conclusions of law:

### FINDINGS OF FACT

1. Plaintiff SeaRiver Maritime, Inc. ("SeaRiver"), a successor to Exxon Shipping Company, is a Delaware Corporation. SeaRiver employs seamen and operates seagoing vessels as part of its maritime shipping business.

2. Defendant Industrial Medical Services ("IMS") is a California corporation. IMS operates several industrial medical clinics which provide medical services to employers such as SeaRiver. In 1992, IMS operated two clinics in San Francisco, California.

3. In 1992, IMS was owned by Joel Renbaum, M.D., Inc. Since that time, IMS has been merged with Joel Renbaum, M.D. Inc., d/b/a Occupational Health Network ("OHN").

Occupational Health Network is a successor in interest to IMS.

4. Joel Renbaum, M.D. is a board-certified orthopaedic surgeon who owns and consults with the IMS/OHN clinics, but spends the majority of his time in his private practice as an orthopaedic surgeon.

5. IMS/OHN sees a wide variety of patients from different industries and occupations, including merchant mariners.

6. In 1992, the Valencia Street Clinic of IMS was staffed by a medical director, Dr. Alistair Smith, and various physicians and physicians' assistants. A physicians' assistant cannot write prescriptions or admit patients to a hospital, but is otherwise an extension of a physician. A physicians' assistant must be supervised by a physician holding a physicians' assistant supervisory license. The supervising physician need not be on site while a physicians' assistant is working, but must review and critique the assistant's documentation and treatment.

7. For eight to ten years, SeaRiver regularly referred its employees in need of medical treatment to IMS in San Francisco.

8. Defendant David A. Smith, M.D. ("Dr. Smith") was hired as a *locum tenens* physician by IMS. A *locum tenens* physician is one employed on a temporary basis, often to substitute for vacationing or otherwise absent permanent physicians.

9. Dr. Smith graduated from medical school at the University of California at San Diego in 1989. He completed his internship in general surgery at the University of California at San Francisco ("UCSF") in June 1990 and received his medical license in February 1991.

10. Dr. Smith entered a general surgery residency program at UCSF in July 1990. After completing two years of a seven to nine year residency, members of the UCSF Resident Coordination and Review Committee ("RCRC") dismissed Dr. Smith from the program. The members of the RCRC reached this decision after investigating several incidents which raised concerns regarding Dr. Smith's honesty, trustworthiness, communication and interpersonal skills, and ability to handle the stress of a general surgery prac-

tice. In dismissing him from its residency program, the UCSF Department of General Surgery concluded that Dr. Smith should practice medicine only under close supervision and not under arduous conditions such as working late hours or without sufficient sleep.

11. In October 1992, IMS hired Dr. Smith through a physicians' registry service known at that time as Western Physicians Registry. It is standard practice in the industry for occupational medical clinics to use a physicians' registry to assist in hiring physicians.

12. IMS had previously informed James Ellis of Western Physicians Registry that its *locum tenens* physicians should be licensed to practice medicine in California, should be familiar with and capable of performing in an occupational medical setting, and should have good interpersonal skills.

13. Western Physicians Registry interviewed Dr. Smith, received his resume and reference from two physicians, and determined that he met the criteria set forth by IMS. Although the Western Physicians Registry contacted the references provided by Dr. Smith, it did not contact anyone from UCSF to inquire into the reason Dr. Smith had left the residency program.

14. Western Physicians Registry referred Dr. Smith to IMS and provided IMS with verification of Dr. Smith's medical license, his curriculum vitae, and his references.

15. IMS hired Dr. Smith as a *locum tenens* physician to work at its Valencia Street Clinic for seven to nine days. In doing so, IMS relied entirely on the screening performed by Western Physicians Registry. IMS hired Dr. Smith without interviewing him, without checking his references, without requesting any information from UCSF, and without reviewing any written information regarding Dr. Smith's credentials or qualifications. Dr. Smith did have a telephone conversation with Joel Renbaum before beginning work at IMS, during which time Renbaum stated that he was available if Dr. Smith needed assistance. Dr. Smith received a brief orientation as to the layout and workings of the Valencia Street Clinic, but did not receive any clinical or medical training.

16. Records introduced at trial, as well as testimony from Dr. Smith, Dr. Lane, and RCRC member Linda Riley establish that: (1) Dr. William Schecter, a reference provided by Dr. Smith to Western Physician's Registry and IMS, was aware of the circumstances surrounding Dr. Smith's departure from the UCSF residency program; (2) UCSF maintained a file on Dr. Smith which contained information regarding Dr. Smith's departure from the residency program, and also indicated the circumstances under which Dr. Smith could safely practice medicine; (3) Dr. Smith's curriculum vitae contained false information regarding publications he claimed to have authored and the nature of his clinical and work experience.

17. IMS did not supervise Dr. Smith's treatment of patients during the time he worked at the Valencia Street Clinic. IMS also did not review Dr. Smith's medical charts during this time.

18. Dr. Smith was working double shifts as a locum tenens physician during the week that he treated Richards at IMS. For example, Dr. Smith worked from 6:00 p.m. to 7:00 a.m. at Manteca Hospital on October 25, 1992, drove 90 minutes by car to San Francisco on the morning of October 26, 1992, and worked that day at the IMS Valencia Street Clinic from 8:30 a.m. to 4:30 p.m.

19. Christopher Richards, plaintiff in the underlying action, is a forty-six year old, African–American male. He began work as a seaman at age eighteen. In September 1992, Richards was employed as a seaman by SeaRiver. He worked aboard the "Exxon Philadelphia" from July through September, 1992.

20. According to the findings of fact made by Judge Hugh Gibson in the Texas action, on September 14, 1992, Richards began experiencing pain and a sharp tightening in his right forearm during a shift aboard the Exxon Philadelphia. Richards reported these symptoms to Captain David Leonard Grove and was thereafter placed on restricted work duty.

21. Between September 14, 1992 and September 17, 1992, Richards was assigned to perform "light duties." During this peri-

od, he performed housekeeping duties such as sweeping, mopping, and cleaning bathrooms; performed bridge and anchor watch; and participated in tank cleaning.

22. On September 17, Richards was examined by Dr. Richard A. Ferse at the Swedish Medical Center/Ballard in Seattle, Washington. Dr. Ferse indicated in a written report that Richards was fit for duty and that he was to consult with his family physician in Miami, Florida if the pain in his elbow did not resolve within one week. Richards thereafter spent his regularly scheduled days off in Miami, relaxing and resting his elbow.

23. On October 25, Richards reported to work aboard the "Exxon Benecia." When Richards reported for duty, he informed Captain George Borawski that he was injured.

24. On October 26, 1992, SeaRiver sent Richards to IMS for evaluation and treatment of his right arm. Richards was examined on this date by Dr. Smith.

25. When Dr. Smith treated Richards, he had limited experience treating seamen and limited familiarity with the tasks performed by able-bodied seamen. Dr. Smith also had limited experience treating lateral epicondylitis and administering corticosteroids. Dr. Smith received limited training in orthopedics during his internship and abbreviated residency.

26. Upon examining Richards, Dr. Smith noted that Richards "had a history of sharp lancing pain and reflex weakness in his right arm to extension and supination, very tender supernator [sic] origins in extensor aspect right arm."

27. Based on this examination and Richards' representations, Dr. Smith diagnosed Richards' injury as lateral epicondylitis, commonly known as "tennis elbow." He prescribed an elbow brace, Motrin, and occupational therapy. Dr. Smith requested that Richards return to the IMS clinic on October 28, 1992. He estimated that Richards' disability would last four weeks and indicated on an Individual Disability Report given to SeaRiver that Richards should not engage in heavy pushing or pulling with his right arm.

28. Lateral epicondylitis results from tears of the tendon extensors as they connect to the epicondyle. The condition involves a process of microscopic death and degeneration of tissue, inflammation, absorption, and healing. In some cases, lateral epicondylitis may recur after a full course of treatment. However, most cases of lateral epicondylitis resolve without the need for surgery and without resulting in permanent physical damage.

29. Any motion that requires forceful stabilization of the wrist, including forceful grips or twists of the arm, may exacerbate the condition of lateral epicondylitis.

30. Richards attended physical therapy sessions at St. Luke's Hospital on September 27 and 28, 1992.

31. Richards returned to IMS on October 28, 1992. He was again seen by Dr. Smith. After noting that Richards' condition had not significantly improved, Dr. Smith injected Richards' right elbow with a solution containing a corticosteroid known as Kenalog–40 ("K–40") and an anesthetic known as lidocaine.

32. Dr. Smith then released Richards to modified work status, with a lifting limitation of zero to twenty-five pounds, a limited capacity for climbing and reaching, a restriction from pushing or pulling, and a restriction on "weighted twisting or extension of right wrist against tension."

33. Based on the medical chart entry made by Dr. Smith on October 28, 1992, as well as on the testimony of SeaRiver's medical experts, Dr. Lane and Dr. Bunce, the Court finds that Dr. Smith injected Richards with 3 cc's (or 120 milligrams) of Kenalog–40 and 2 cc's (or 80 milligrams) of a one-percent solution of lidocaine. An IMS medical chart entry dated October 28, 1992 contains a notation by Dr. Smith which reads: "lateral epicondyle injected with 3 cc K–40 and 2 cc 1% lido[caine]." According to Dr. Lane, this chart entry follows standard medical format and states that 3 cc's of Kenalog–40 was administered to Richards' right elbow.

34. The Court finds that Dr. Smith's testimony that the chart entry indicates an injection of one cc of Kenalog–40 is not credible. The Court also finds that Dr. Smith's testimony that he specifically recalls adminis-

tering the injection to Richards is not credible.

35. The testimony of SeaRiver's medical experts and the medical literature introduced at trial establish that the recommended dosage of Kenalog–40 is between 2.5 and 10 milligrams for a small joint. The lateral epicondyle is considered to be a small joint. SeaRiver's medical experts and the medical literature introduced at trial establish that an injection of up to 40 milligrams, or one cc, is appropriate for larger joints such as the shoulder or hip, but not for smaller joints.

36. On October 26, 1992, and again on October 28, 1992, Dr. Smith spoke with Tom Shearer, senior personnel manager specialist for SeaRiver, regarding whether SeaRiver could accommodate the work restrictions he had placed on Richards. Shearer informed Dr. Smith that an extra able bodied seaman was aboard the Exxon Benicia at that time and that the work restrictions placed on Richards could be accommodated.

37. Upon returning to the Exxon Benicia, Captain Borawski and first mate John Poulos assigned Richards to "light duties." Richards updated the vessel's Ocean Fleet Safety Manual and performed housekeeping tasks. One of the tasks Captain Borawski assigned Richards was to "suegee" bookshelves. This task involved removing books from a shelf, wiping the shelf with a cloth, and replacing the books. Richards also operated a winch during a docking procedure. According to Captain Borawski, in performing these tasks, Richards may have exceeded the work limitations placed upon him.

38. On November 11, 1992, Richards returned to IMS for a scheduled follow-up visit. On this date, he was treated by Fred Dugger, a physicians' assistant employed by IMS.

39. After spending twenty-one years as a medic in the U.S. Military, Dugger attended a two year Physicians' Assistant program at Stanford University. He became licensed by the State of California as a physicians' assis-

tant in 1978 and has worked as a physicians' assistant in industrial and occupational medical settings since that time. He began working for IMS in 1988.

40. After examining Richards, Dugger concluded that his lateral epicondylitis had resolved. He then released Richards to unrestricted work duty. No physician at IMS co-signed Dugger's chart entry dated November 11, 1992 or approved Dugger's releasing Richards to full work duty.

41. As of November 11, 1992, Richards' lateral epicondylitis had not resolved. The excessive dosage of Kenalog–40 administered by Dr. Smith on October 28, 1992 had not been absorbed into Richards' body as of the date he was released to full work duty.[1] Rather, the corticosteroid remained at the injection site, continuing to inhibit the inflammatory response normally experienced with a tendon injury. The reduction in inflammation interfered with the normal tissue healing process and eliminated the pain Richards would have experienced upon performing certain tasks with his right arm. Richards subsequently overused his right arm, thereby permanently damaging the tissue surrounding the tendon.

42. An overdose of corticosteroid may cause hypopigmentation and atrophy of the skin, as well as dissolution of the bone where the tendon attaches to the bone. The overdose of Kenalog–40 administered to Richards caused hypopigmentation of the skin surrounding the injection site.[2]

43. After being released to full work duty on November 11, 1992, Richards was assigned the tasks of an able bodied seaman aboard several different vessels operated by SeaRiver. He also worked overtime shifts during this period.

44. In April, 1993, Richards once again began to experience pain in his right arm. According to Dr. Lane, this recurrence of pain coincides with the time in which 3 cc's or

---

1. According to Dr. Lane, the pain associated with lateral epicondylitis generally returns within two to three weeks of an injection of the proper dosage of corticosteroid.

2. It is unclear whether Richards experienced any atrophy due to the overdose of corticosteroid. Dr. Lane testified that a skin biopsy performed in April 1993 was inconclusive on this matter. Dr. Blink testified that the biopsy indicated that no atrophy had occurred.

120 milligrams of Kenalog–40 would be expected to be absorbed into the body.

45. The Court finds that the pain experienced by Richards in April 1993 did not result from a second, separate injury but resulted from the decreased anesthetic effect of the earlier overdose of Kenalog–40.

46. Richards was subsequently treated by two doctors in Miami, Florida. Dr. Armstead diagnosed Richards as suffering from bursitis of the right elbow. Dr. Weiss found that Richards had over-stressed and torn the tendon attachment in his right elbow. On August 10, 1993, Richards underwent surgery to his right elbow.

47. During physical therapy rehabilitation after his surgery, Richards suffered a torn rotator cuff injury to his right shoulder. On August 25, 1994, Richards underwent orthoscopic surgery to repair his torn rotator cuff.

48. Based on testimony proffered by both parties' medical experts, the Court finds that Richard's lateral epicondylitis was a significant cause of his subsequent shoulder injury.

49. Richards is permanently disabled from lifting more than twenty-five pounds and can no longer perform the work of an able bodied seaman.

50. Richards sued SeaRiver in the United States District Court for the Southern District of Texas, Galveston Division. He alleged Jones Act liability and unseaworthiness under general maritime law.

51. The Honorable Hugh Gibson presided over a court trial, bifurcated on the issues of liability and damages. The court found both SeaRiver and Dr. Smith to be negligent in failing to provide adequate medical care to Richards, proximately causing his injury. Specifically, the court found SeaRiver negligent in failing to enforce prescribed work restrictions and in returning plaintiff to work on October 28, 1992. The court also found Dr. Smith negligent in administering an overdose of corticosteroid and in returning Richards to duty on October 28, 1992. Finally, IMS was found negligent in releasing plaintiff to full duty on November 11, 1992.

52. After the conclusion of the liability phase of the Texas trial, SeaRiver notified IMS of its indemnity claims and tendered its defense for purposes of the damages phase of trial. IMS did not accept this tender. SeaRiver's attempts to contact Dr. Smith at this time were unsuccessful.

53. The Texas court conducted the damages phase of the trial and entered judgment against SeaRiver in the amount of $477,777.00. The Texas court concluded that the disability benefits paid by SeaRiver to Richards were not subject to the "collateral source rule" and awarded SeaRiver a set-off in the amount of $31,231.79 for disability benefits previously paid. The court therefore rendered judgment against SeaRiver in the amount of $446,545.21.

54. Prior to trial, Richards and SeaRiver had entered into a "high-low" agreement whereby SeaRiver agreed to satisfy judgment imposed by the Texas court by paying Richards no less than $50,000 but no more than $300,000. Pursuant to this agreement, SeaRiver satisfied the judgment rendered by the Texas court by paying Richards $300,000.

55. Richards has assigned to SeaRiver any and all claims that he may have against the defendants named in this action, including claims for medical malpractice, which were or could have been asserted in the Texas suit.

56. On July 6, 1995, SeaRiver filed a complaint in the Northern District of California seeking indemnity from defendants IMS, Joel Renbaum, M.D., Inc., d/b/a Occupational Health Network, and Dr. Smith based on each defendant's negligent conduct. None of these defendants participated in the Texas action.

57. In the instant action, SeaRiver alleges that Dr. Smith negligently administered an excessive dose of corticosteroid to Richards, advised SeaRiver that Richards could return to work, failed to prescribe Richards adequate work restrictions, and failed to communicate such restrictions to SeaRiver. SeaRiver further alleges that physicians' assistant Dugger, an IMS employee, negligently concluded that Richards was fit for duty as an able bodied seaman and returned him to work without restrictions on November 11, 1992, and that IMS negligently hired and failed to supervise its medical staff.

## CONCLUSIONS OF LAW

1. Jurisdiction in this case is based upon 28 U.S.C. § 1332, as well as the Court's general admiralty and maritime jurisdiction.

■ 2. Plaintiff SeaRiver is barred by principles of collateral estoppel from re-litigating the issue of negligence on the part of its employees, Captain Borawski and Tom Shearer. This issue involves the same parties, was actually litigated and decided in the Texas action, and was necessary to the judgment rendered in the earlier action. *See Clark v. Bear Stearns & Co.*, 966 F.2d 1318 (9th Cir.1992).[3]

■ 3. However, defendants IMS, Renbaum, and Dr. Smith were not parties to the Texas action. Moreover, the Court finds that SeaRiver did not represent the interests of these defendants in the underlying action such that a relationship of privity existed between the parties. Thus, these defendants are not barred by principles of collateral estoppel from re-litigating issues regarding their liability for the injuries sustained by Richards. Nor are these defendants bound by the judgment of the Texas Court regarding damages.

### NEGLIGENT PROVISION OF MEDICAL CARE

■ 4. To establish negligence under California law, plaintiff must establish (1) defendant's legal duty of care toward plaintiff; (2) defendant's breach of that duty; (3) injury proximately or legally caused by that breach; and (4) damage to plaintiff. *Hoyem v. Manhattan Beach School Dist.*, 22 Cal.3d 508, 514, 150 Cal.Rptr. 1, 585 P.2d 851 (1978).

■ 5. A physician must exercise that degree of skill or care possessed by doctors in good standing practicing in the same locality under similar circumstances. *Flowers v. Torrance Memorial Hospital Medical Center*, 8 Cal.4th 992, 1001, 35 Cal.Rptr.2d 685, 884 P.2d 142 (1994). A physician is liable for injuries to a patient caused by failure to possess and to exercise such skill and care, in either diagnosis or treatment. *Landeros v. Flood*, 17 Cal.3d 399, 408, 131 Cal.Rptr. 69, 551 P.2d 389 (1976). Therefore, Dr. Smith

and Fred Dugger were required to possess and to exercise that degree of skill and care ordinarily possessed and exercised by other physicians and physicians' assistants working in occupational medical clinics, and are liable for injuries to patients that result from failure to do so.

■ 6. The Court finds that Dr. Smith breached his duty of care to Richards by negligently administering an amount of corticosteroid that is greatly in excess of the recommended and appropriate dosage. Administration of 3 cc's (or 120 milligrams) of Kenalog–40 to a small joint such as the elbow is a gross deviation from the accepted standard of care. Moreover, the Court finds that administration of even one cc of Kenalog–40 would fall below the standard of care under the circumstances of this case.

7. The Court finds that Dr. Smith also breached his duty of care toward Richards by failing to prescribe sufficient muscle strengthening and rehabilitation exercises.

■ 8. The Court finds that Dr. Smith's negligence proximately caused permanent injury to Richard's elbow and shoulder, resulting in his permanent disability. Dr. Smith's overdose of Kenalog–40 reduced the inflammation in Richards' elbow, inhibiting the healing process and masking the normal pain response. This led Richards to use his injured arm in such a way as to cause permanent damage.

9. The Court therefore finds Dr. Smith liable for negligence.

■ 10. The Court finds that physicians' assistant Fred Dugger breached his duty of care to SeaRiver and to Richards. Dugger negligently failed to review Richards' medical file and to recognize that Richards' ostensible "recovery" from lateral epicondylitis on November 11, 1992 was explained by the excessive dose of corticosteroid administered by Dr. Smith two weeks earlier. Dugger negligently released Richards to full duty as an able bodied seaman, without any work restrictions and without prescribing any physi-

---

**3.** As noted during trial, the Court did consider testimony regarding the conduct of Captain Borawski and Tom Shearer in determining the proper allocation of damages between SeaRiver and the various defendants.

cal therapy or muscle strengthening program.

11. The Court finds that Fred Dugger's negligence proximately caused permanent injury to Richard's elbow and shoulder, resulting in his permanent disability. Dugger's failure to recognize the cause of Richards' ostensible "recovery" and his release of Richards to unrestricted work duty allowed Richards to use his injured arm in such a way as to cause permanent damage.

12. IMS is liable to SeaRiver for the negligent acts of its employees, Dr. Smith and Fred Dugger. See *Golden v. Conway,* 55 Cal.App.3d 948, 957, 128 Cal. Rptr. 69 (1976) (holding employer liable for contractor's lack of skill or failure to exercise due care); *Holman v. California,* 53 Cal. App.3d 317, 336, 124 Cal.Rptr. 773 (1975) (same); *Perez v. Van Groningen & Sons, Inc.,* 41 Cal.3d 962, 967, 719 P.2d 676 (1986) (holding employer liable for acts of employee under theory of respondeat superior).

### NEGLIGENT HIRING AND SUPERVISION

13. In California, an employer may be held liable for negligent hiring if he knows or has reason to know that an employee hired or retained is incompetent or unfit to perform the duties required of the job, or if he fails to use reasonable care to discover the employee's incompetence or unfitness before hiring him. *See Evan F. v. Hughson United Methodist Church,* 8 Cal.App.4th 828, 842–43, 10 Cal.Rptr.2d 748 (1992); *Roman Catholic Bishop of San Diego v. Superior Court,* 42 Cal.App.4th 1556, 1564–65, 50 Cal. Rptr.2d 399 (1996); *Golden v. Conway,* 55 Cal.App.3d 948, 957, 128 Cal.Rptr. 69 (1976). An employer who negligently fails to employ a competent and careful contractor may be liable for injuries due to the contractor's lack of skill or failure to exercise due care, provided that the employer had, or should have had, some reason to suspect that the person hired would be incapable of competent performance. *See Holman v. California,* 53 Cal. App.3d 317, 336, 124 Cal.Rptr. 773 (1975); *Risley v. Lenwell,* 129 Cal.App.2d 608, 622, 277 P.2d 897 (1954).

14. The Court finds that IMS failed to use reasonable care to discover Dr. Smith's unfitness to practice as a *locum tenens* physician at its Valencia Street Clinic. Although the Western Physicians Registry provided IMS with Dr. Smith's curriculum vitae and references, IMS did not inquire into Smith's qualifications and experience before hiring him as a *locum tenens* physician, and did not inquire into why Dr. Smith left the UCSF residency program prematurely. IMS did not personally interview Smith, did not check his references, and did not verify the information contained in his curriculum vitae.

15. Credible evidence and testimony offered at trial persuade this Court that had IMS made such inquiries, it would have been informed that Dr. Smith should not practice medicine under stressful conditions, such as working long hours and without sufficient sleep, and that Dr. Smith's work should always be supervised. The Court finds that this information would have given IMS reason to suspect that Dr. Smith would be incapable of competent performance as a *locum tenens* physician at its Valencia Street Clinic.

16. Therefore, the Court finds that IMS is liable to SeaRiver for negligently hiring Dr. Smith.

17. The Court finds IMS liable to SeaRiver for negligently failing to supervise Dr. Smith. The Court finds that IMS allowed Dr. Smith to work at its Valencia Street Clinic without proper guidance or supervision, and that IMS negligently failed to review Smith's chart entries regarding his treatment of and recommendations regarding Richards.

18. The Court finds IMS liable to SeaRiver for negligently failing to supervise physicians' assistant Fred Dugger. Specifically, IMS failed to review Dugger's examination of Richards and permitted Richards to be released to unrestricted work duty on November 11, 1992, absent any physician review.

19. IMS's failure to adequately supervise Dr. Smith permitted his injection of an excessive dose of corticosteroid to go unnoticed. IMS's failure to adequately supervise physicians' assistant Fred Dugger permitted Rich-

ards to be released to full work duty while still injured and while an overdose of corticosteroid masked the normal pain response. These events combined to cause permanent injury to Richards' elbow and shoulder.

### EQUITABLE INDEMNITY

20. Equitable indemnity arises by operation of law and is based on principles of equity. A party who is not at fault but nonetheless is held liable by reason of its relationship to another, such as an employer who is vicariously liable for the acts of his employee, may seek equitable indemnity. See Restatement 2d, Torts § 886B(2)(a); *Hydro–Air Equipment, Inc. v. Hyatt Corp.*, 852 F.2d 403, 405–06 (9th Cir.1988); *Alisal Sanitary Dist. v. Kennedy*, 180 Cal.App.2d 69, 4 Cal.Rptr. 379 (1960).

21. The Jones Act creates a negligence cause of action for a seaman only against his employer. *California Home Brands, Inc. v. Ferreira*, 871 F.2d 830, 833 (9th Cir.1989); *Allen v. United States*, 338 F.2d 160, 162 (9th Cir.1964).

22. Under principles of general maritime law, "indemnification is not available *unless the indemnitor could be held directly liable to the person injured." California Home Brands*, 871 F.2d at 833 (emphasis added). Thus, where an injured seaman has an independent cause of action against a third party, yet sues only his employer, the employer is entitled to indemnification from that third party. *See California Home Brands*, 871 F.2d at 833; *Cooper Stevedoring Co. v. Fritz Kopke, Inc.*, 417 U.S. 106, 112–14, 94 S.Ct. 2174, 2178, 40 L.Ed.2d 694 (1974) (holding that where injured longshoreman could have proceeded against either vessel owner or third party or both to recover full damages for his injury, vessel owner was entitled to seek contribution from third party).

23. Richards had a direct cause of action against both Dr. Smith and Fred Dugger for negligence or medical malpractice, and against IMS and its successor Joel Renbaum, d/b/a Occupational Health Network, for negligent hiring and supervision. Therefore, SeaRiver is entitled to equitable indemnity from each of these defendants.

24. Based on the foregoing, defendants' "Motion for Nonsuit On Claims Against David Smith, M.D.," which argues that plaintiff has failed to establish a legal basis for indemnity against Dr. Smith, is denied.[4]

### IMPLIED CONTRACTUAL INDEMNITY

25. Contractual indemnity arises from contract and is governed by principles of contract law. Contractual indemnity may be based on either an express or implied contract.

26. Under maritime law, a party is entitled to implied contractual indemnity in the absence of an express contract if a special relationship exists between the would-be indemnitor and indemnitee and the facts establish negligence on the part of the would-be indemnitor. *See Araujo v. Woods Hole*, 693 F.2d 1, 2–3 (1st Cir.1982).

27. An agreement between a vessel owner and a medical provider is a maritime contract which includes an implied warranty of workmanlike performance. *Maritime Overseas Corp. v. United States*, 433 F.Supp. 419, 421 (N.D.Cal.1977). A breach of the implied warranty of workmanlike performance entitles the vessel owner to indemnification if such breach causes injury to a seaman. *Campbell Industries, Inc. v. Offshore Logistics Int'l*, 816 F.2d 1401 (9th Cir.1987).

28. The Court finds that an implied in fact contract existed between SeaRiver and IMS. SeaRiver and IMS developed an understanding, based on their relationship and past' dealings, that SeaRiver would send its injured employees to IMS, and that in return, IMS would provide competent medical treatment to those employees.

---

4. At the close of plaintiff's case-in-chief, Dr. Smith made a "motion for nonsuit" pursuant to Fed.R.Civ.P. 41(b) as to each of plaintiff's claims against him. At the Court's request, Dr. Smith submitted a written memorandum in support of this motion.

The Court notes that the 1991 Amendments to the Federal Rules of Civil Procedure establish that a "motion for nonsuit" should now be treated as a "motion for judgment on partial findings" as provided by Fed.R.Civ.P. 52(c). *See* Advisory Committee Notes, Fed.R.Civ.P. 41(b).

29. It was implied in the agreement between SeaRiver and IMS that the doctors employed by IMS would exercise reasonable medical care in examining and treating Christopher Richards. It was further implied in the agreement that SeaRiver would be indemnified against loss resulting from negligence or breach of duty by IMS or its agents. *See Maritime Overseas,* 433 F.Supp. at 422.

30. Therefore, the Court finds that SeaRiver is entitled to indemnification from defendant IMS, and its successor Joel Renbaum, d/b/a Occupational Health Network, based on implied contractual indemnity.

31. No express contract existed between SeaRiver and Dr. Smith. Therefore, the Court finds that SeaRiver is not entitled to indemnification from Dr. Smith based on express contractual indemnity.

■ 32. The Court finds that no implied contract existed between SeaRiver and Dr. Smith. The relationship between SeaRiver, a client of IMS, and Dr. Smith, a *locum tenens* physician retained by IMS on a part-time basis, is not sufficiently close to be a generally recognized special relationship.[5]

33. Therefore, the Court finds that SeaRiver is not entitled to indemnification from Dr. Smith based on implied contractual indemnity.

### *COMPARATIVE INDEMNITY*

■ 34. California common law recognizes a right of partial indemnity under which liability among multiple tortfeasors may be apportioned according to the comparative negligence of each. *Western Steamship Lines, Inc. v. San Pedro Peninsula Hosp.,* 8 Cal.4th 100, 108–09, 32 Cal.Rptr.2d 263, 876 P.2d 1062 (1994). Thus, the doctrine of comparative fault articulated in *Li v. Yellow Cab Co.,* 13 Cal.3d 804, 119 Cal.Rptr. 858, 532 P.2d 1226 (1975) applies to this action.

■ 35. The Texas court found that SeaRiver was negligent in failing to provide Richards with adequate medical care and that this negligence was the proximate cause of Richards' injury. This holding was partially based on SeaRiver's strict vicarious liability for the negligence of those it employs to provide medical treatment for its injured employees. *See Central Gulf Steamship Corp. v. Sambula,* 405 F.2d 291, 297 (5th Cir.1968); 46 U.S.C. § 688. SeaRiver is entitled to indemnification as to this portion of liability.

36. However, the Texas court also found that SeaRiver was itself negligent on several independent bases. The court found that SeaRiver was negligent in failing to define the nature of "light duties" and that Richards was therefore assigned tasks by his supervisors that exceeded his physical capabilities. The Texas Court found that Captain Borawski and Tom Shearer negligently failed to inquire into and discern the full extent and nature of Richards' medical limitations, and to convey the extent of those limitations to the chief mate. The Texas court found that Captain Borawski negligently assigned plaintiff duties inconsistent with his physical condition and that Tom Shearer negligently concluded that Richards should be returned to the ship on October 28, 1992. SeaRiver is not entitled to indemnification as to this portion of its liability.

■ 37. A calculation of comparative indemnity must also consider any contributory negligence that may be attributed to Richards. Although contributory negligence is not a complete bar to recovery under the Jones Act, it will reduce the amount of plaintiff's recovery. *Simeon v. T. Smith & Son, Inc.,* 852 F.2d 1421, 1430 (5th Cir.1988); *Drake Towing Co. v. Meisner Marine Construction Co.,* 765 F.2d 1060, 1067 (11th Cir.

---

5. In response to Dr. Smith's "motion for nonsuit," SeaRiver argued that because *Hydro–Air Equipment, Inc. v. Hyatt Corp.,* 852 F.2d 403 (9th Cir.1988), establishes a broad right to indemnification in terms of the relationship between the parties, Dr. Smith's motion should be denied. However, *Hydro–Air* does not address implied contractual indemnity. *Hydro–Air* holds that implied *equitable* indemnity is not limited to certain well-defined situations involving joint tortfeasors, principal and agent, or employer and employee. Rather, "the equitable nature of implied equitable indemnity is designed to prohibit one from profiting by his own wrong at the expense of one who is either free from fault or negligent to a lesser degree." *Id.* at 406. Thus, while *Hydro–Air* supports SeaRiver's claim against Dr. Smith under implied equitable indemnity, it does not support a claim under implied *contractual* indemnity.

1985); *Joia v. Jo–Ja Service Corp.*, 817 F.2d 908 (1st Cir.1987).

38. The Court concludes that defendants did not provide sufficient evidence at trial to establish contributory negligence on Richards' part. Therefore, defendants are not entitled to an offset in the amount of damages assessed against them based on any negligence attributable to Richards.

39. The Court finds that the negligent acts and omissions of SeaRiver employees Tom Shearer and Captain Borawski contributed ten percent to the injuries sustained by Richards. Tom Shearer was negligent in failing to inquire into the full extent and nature of the work restrictions placed on Richards and in failing to convey this information to those responsible for supervising Richards' duties aboard the Exxon Benicia. Captain Borawski was negligent in assigning or allowing chief mate John Poulos to assign Richards tasks which exceeded his physical capabilities, including "suegeeing" book shelves. Captain Borawski admitted at trial that the performance of this task might require Richards to violate work limitations prescribed by Dr. Smith, including one restricting "weighted twisting or extension of [the] right wrist against tension," and one finding that Richards had a "limited capacity" to lift objects weighing between zero and twenty-five pounds.

40. The Court finds that the negligent acts and omissions of defendants IMS and Joel Renbaum, d/b/a/ Occupational Health Network, contributed thirty percent to the injuries sustained by Richards. IMS and Renbaum are directly liable for the negligent hiring of Dr. Smith, as well as the negligent supervision of both Dr. Smith and Fred Dugger.

41. The Court finds that the negligence of physician's assistant Fred Dugger contributed five percent to the injuries sustained by Richards.

42. The Court finds that the negligence of defendant Dr. Smith contributed fifty-five percent to the injuries sustained by Richards.

43. The Court finds that under the doctrine of respondeat superior, defendants IMS and Renbaum are vicariously liable for the negligent acts of IMS employees Fred Dugger and Dr. Smith.

44. A Jones Act defendant may be held jointly and severally liable with a defendant whose liability arises under state or general maritime law. *See e.g., Simeon v. T. Smith & Son, Inc.*, 852 F.2d 1421, 1431 (5th Cir.1988); *Joia v. Jo–Ja Service Corp.*, 817 F.2d 908, 915–18 (1st Cir.1987); *Ebanks v. Great Lakes Dredge & Dock Co.*, 688 F.2d 716 (11th Cir.1982), *cert. denied,* 460 U.S. 1083, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983). The Court finds that defendants IMS, Joel Renbaum, d/b/a/ Occupational Health Network, and Dr. Smith are jointly and severally liable for ninety percent of the damages suffered by Richards.

### DAMAGES

45. SeaRiver paid Richards $300,000 in satisfaction of the $446,545.21 judgment rendered in the Texas action.

46. SeaRiver paid Richards $31,231.79 in benefits under its short and long term disability plans.

47. SeaRiver paid Richards $14,940 for "maintenance". Under maritime law, maintenance payments compensate an ill or injured seaman for room and board which, but for his illness or injury, would have been provided aboard the vessel. *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 527, 58 S.Ct. 651, 652–53, 82 L.Ed. 993 (1938).

48. SeaRiver paid Richards $30,745.49 for "cure". Under maritime law, cure payments compensate an ill or injured seaman for necessary medical expenses until the seaman reaches maximum medical improvement. *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 527, 58 S.Ct. 651, 652–53, 82 L.Ed. 993 (1938). SeaRiver made cure payments to Richards to compensate him for medical expenses related to his elbow and shoulder injuries.

49. The Medical Injury Compensation Reform Act of 1975 ("MICRA"), California Civil Code §§ 3333 *et seq.,* applies to an action brought by a vessel owner for indemnification based upon the allocation of proportional fault for injuries to the vessel own-

er's employee. *See Western · Steamship Lines, Inc. v. San Pedro Peninsula Hosp.,* 8 Cal.4th 100, 32 Cal.Rptr.2d 263, 876 P.2d 1062 (1994).[6]

50. California Civil Code § 3333.2(b) limits the size of an award of noneconomic damages in any personal injury action against a health care provider based on professional negligence to $250,000. Under this section, SeaRiver's indemnity for payments made for noneconomic damages pertaining to the negligence of Dr. Smith and Fred Dugger must be limited to $250,000.

51. In the Texas action, Richards was awarded $402,777.00 for past and future lost wages and benefits. These damages are economic in nature and are not limited by MICRA.

52. In the Texas action, Richards recovered $75,000 for "past and future pain and suffering and loss of enjoyment of life." This amount is well within the recovery limits set by California Civil Code § 3333.2(b).

53. Therefore, the Court finds that MICRA does not limit SeaRiver's recovery for a portion of the $300,000 it paid to Richards in satisfaction of judgment rendered in the Texas action.

■ 54. California Civil Code § 3333.1(a) partially abolishes the "collateral source rule" in actions for personal injury against a medical provider by allowing the defendant to introduce evidence of a "collateral source" such as health or disability insurance benefits and by allowing the trier of fact to consider this alternate source of recovery in computing the damages to be awarded. In addition, California Civil Code § 3333.1(b) precludes a "collateral source" which has provided medical payments or oth-

er benefits to a plaintiff from obtaining reimbursement of those expenses from a health care provider sued for professional negligence. *Barme v. Wood,* 37 Cal.3d 174, 180–81, 207 Cal.Rptr. 816, 689 P.2d 446 (1984).[7]

■ 55. Pursuant to California Civil Code §§ 3333.1(a) and (b), the Court finds that plaintiff may not recover from defendants any portion of the $31,231.79 SeaRiver paid to Richards under its short and long term disability plans. These are "collateral benefits" of the type enumerated in California Civil Code § 3333.1(a).[8] Thus, pursuant to California Civil Code § 3333.1(b), SeaRiver may not be subrogated to the rights of Richards against defendants.

■ 56. California Civil Code § 3333.1(b) does not limit SeaRiver's recovery from defendants for the "maintenance" and "cure" payments it made to Richards. Maintenance and cure payments are not benefits of the type enumerated in § 3333.1. A vessel owner's duty to pay maintenance and cure to an injured seaman is "an implied provision in contracts of marine employment." *Aguilar v. Standard Oil Co.,* 318 U.S. 724, 730, 63 S.Ct. 930, 934, 87 L.Ed. 1107 (1943). *See also, Cortes v. Baltimore Insular Line,* 287 U.S. 367, 372, 53 S.Ct. 173, 174, 77 L.Ed. 368 (1932) (maintenance and cure is not a contractual duty but rather a "duty ... imposed by the law itself as one annexed to the employment" of seamen); *Gypsum Carrier, Inc. v. Handelsman,* 307 F.2d 525, 534 (9th Cir.1962). However, benefits paid pursuant to implied contractual provisions are not covered by California Civil Code section 3333.1. *See Brown v. Stewart,* 129 Cal.App.3d 331, 181 Cal.Rptr. 112 (1982) (holding that § 3333.1 does not apply to

**6.** The Court rejects SeaRiver's argument that the supremacy clause prevents a court sitting in admiralty jurisdiction from applying state statutes such as MICRA. As the court in *Western Steamship* noted, "[a]llowing the [defendant] to invoke [California Civil Code] § 3333.2 does not impair [the plaintiff vessel owner's] rights or interests under federal maritime law; it simply leaves one concurrent tortfeasor to pay more of the loss than its proportionate fault." 8 Cal.4th 100, 117 n. 13, 32 Cal.Rptr.2d 263, 876 P.2d 1062 (1994).

**7.** California Civil Code § 3333.1(b) states that "[n]o source of collateral benefits introduced pursuant to subdivision (a) shall recover any

amount against the plaintiff nor shall it be subrogated to the rights of a plaintiff against a defendant."

**8.** California Civil Code § 3333.1 applies to benefits paid "under the Social Security Act, any state or federal income disability or worker's compensation act, any health, sickness or incomedisability insurance, accident insurance that provides health benefits or income-disability coverage, and any contract or agreement of any group, organization, partnership, or corporation to provide, pay for, or reimburse the cost of medical, hospital, dental, or other heath care services." Cal. Civ.Code § 3333.1(a).

Medi–Cal payments because the term "any contract or agreement" contained in that section does not apply to an implied, unilateral contract between the payor and the provider of services but, rather, to an express, bilateral contract between the payor and the provider of services).

57. Therefore, the Court finds that California Civil Code § 3333.1 does not limit SeaRiver's recovery for a portion of the $14,940 it paid to Richards for "maintenance" or the $30,745.49 it paid to Richards for "cure".

58. Based on the foregoing, the Court finds that SeaRiver is entitled to recover (1) ninety percent of $300,000 paid in satisfaction of judgment rendered in the Texas action; (2) ninety percent of the $14,940 it paid to Richards for "maintenance"; and (3) ninety percent of the $30,745.49 it paid to Richards for "cure". Thus, SeaRiver is entitled to a total of $311,116.94 in money damages. As previously noted, defendants IMS, Joel Renbaum, d/b/a/ Occupational Health Network, and Dr. Smith are jointly and severally liable for these damages.

 59. SeaRiver is not entitled to attorneys' fees and legal costs incurred in establishing its right to indemnification in the instant action. *Campbell Industries, Inc. v. Offshore Logistics International, Inc.,* 816 F.2d 1401, 1406 (9th Cir.1987).

60. SeaRiver is entitled to a portion of the attorneys' fees and legal expenses incurred in defending against Richards' claim in the Texas action. *See Campbell Industries, Inc. v. Offshore Logistics International, Inc.,* 816 F.2d 1401, 1406 (9th Cir.1987). However, these fees must be allocated to reflect the extent to which the expenses incurred in the underlying action relate to SeaRiver's defense against its own negligence, as opposed to its liability for the negli-

gence of the third parties for whom it is vicariously liable.

61. SeaRiver alleges that it incurred approximately $156,811 in attorneys' fees and costs in defending the underlying action. However, the Court has not been provided with sufficient evidence from which to determine the extent to which these legal fees and expenses were incurred by SeaRiver in defending against liability for its own negligence as opposed to defending against liability based on the negligence of Dr. Smith and Fred Dugger. Rather than requiring SeaRiver to bear all costs incurred in the Texas action or arbitrarily allocating those fees and expenses among the parties,[9] the Court declines to rule on the issue of attorneys' fees and expenses at this time.

62. SeaRiver is entitled to prejudgment interest, which shall accrue from May 31, 1995, the date of final judgment in the Texas action. *See Cooper v. Loper,* 923 F.2d 1045, 1051 n. 6 (3d Cir.1991) (holding that because prejudgment interest compensates the indemnified party for the use of its money between settlement and reimbursement, interest accrues from the settlement date).

63. The Court finds that all matters concerning attorneys' fees and prejudgment interest are appropriate for adjudication by a magistrate judge. Accordingly, IT IS HEREBY ORDERED THAT:

(1) Pursuant to Civil Local Rule 72–1, all matters concerning attorneys' fees and prejudgment interest are referred to Chief Magistrate Judge F. Steele Langford for purposes of assigning the matters to a magistrate judge.

(2) If necessary, the magistrate judge to whom Chief Magistrate Judge Langford assigns these matters (the "Magistrate Judge") shall set a schedule for supple-

---

**9.** In cases where it is difficult or impossible to allocate fees in an indemnity action, the courts have taken different approaches. In a slightly different context, the Ninth Circuit has held that the parties should bear their respective costs and fees. *See Umpqua River Navigation Co. v. Crescent City Harbor District,* 618 F.2d 588, 596 (9th Cir.1980) (holding that where the plaintiff seeking indemnity was simultaneously defending two actions on identical grounds so that some, if not all, of plaintiff's litigation costs were attributable

to its defense against the claims of another defendant, and where it was virtually impossible to apportion the expenses between the two actions, the parties should bear their respective costs and fees). Where it was impossible to separate the hours spent on defense efforts from those spent on the question of indemnity, the Ninth Circuit also upheld a district court's award of $3,000 in attorneys' fees rather than the $7,500 requested by the prevailing party. *See Davis v. Chas. Kurz & Co., Inc.,* 483 F.2d 184, 188 (9th Cir.1973).

mental briefing on the issue of attorneys' fees.

(3) The Magistrate Judge shall supervise and issue findings and recommendations regarding the amount of attorneys' fees and prejudgment interest to be awarded in this action. The Magistrate Judge shall file the findings and recommendations with the Clerk of Court and serve a copy on the parties in this action.

(4) Pursuant to Civil Local Rule 72–3, unless otherwise provided, within ten (10) days of the service of the findings and recommendations, any party may serve and file objections thereto, together with notice setting the objections for hearing before this Court. The objecting party shall note each particular finding and recommendation to which an objection is made, shall note the legal authority for the objection, and shall propose alternative findings or recommendations.

(5) Unless otherwise provided, within ten (10) days of the service of the objections, any party may serve and file a response thereto. Within five (5) days of the service of the response, the objecting party may file a reply thereto.

(6) This Court's review of the findings and recommendations and objections thereto will conform with Local Rule 72–3.

IT IS SO ORDERED.