[No. 41083. En Banc. December 18, 1969.]

DARRELL MOSS et al., Appellants, v. WARREN E. VADMAN et al., Respondents, SHARON L. MOSS et al., Appellants.*

*Perkins, Coie, Stone, Olsen & Williams* and *Theodore J. Collins,* for appellants.

*Brodie, Fristoe & Taylor, E. Robert Fristoe, O'Leary, Meyer & O'Leary,* and *Ernest L. Meyer,* for respondents.

FINLEY, J.—This action was brought by the plaintiffs, Darrell Moss and Robert Robbins[1] (partners who bought and sold real estate) against Warren Vadman[1] (their accountant who also advised them from time to time on their real estate transactions). Their complaint was that he had failed to assign to them an option to purchase 1,163.30 acres

*Reported in 463 P.2d 159.

[1] The names of wives of all parties have been omitted since they have no bearing on the issues discussed.

of land referred to herein as the Mottman tract. The option was obtained by Vadman under circumstances and conditions hereinafter described.

This particular property had a special value in 1966, it being large enough to be an acceptable site for the campus of a new 4-year college which it was believed the 1967 legislature would establish in Thurston County.[2] Title to the property was in Mottman Mercantile Company, a corporation owned by the members of the Mottman family.

Vadman assigned the option to Richard Swanson, James Swanson and James Whisler,[1] who were also made parties defendant in this action. They in turn assigned the option to a corporation owned by them, and that corporation subsequently exercised the option, bought the property, and expended substantial amounts in its development. That corporation (Evergreen Park, Inc.) was also made a party defendant.

The plaintiffs, alleging violation of Vadman's duties to them as their agent, sought a judgment against him for an amount somewhat less than the amount of the finder's fee he received from the Swansons and Whisler (hereinafter called the Swanson-Whisler group). The plaintiffs also sought to establish an interest in the Mottman tract on the theory of a constructive trust, and filed a lis pendens based on that claim. In the alternative they sought to recover the profit which they would have obtained had the option been assigned to them.

The trial court dismissed the action on the basis of its conclusions that Vadman was not the agent of the plaintiffs in procuring the option; that he breached no fiduciary relationship in assigning the option to the Swanson-Whisler group; and that consequently no constructive trust was established. From that dismissal, the plaintiffs have appealed.

We feel that the case turns on the issue of whether there was a breach of a fiduciary relationship between the plaintiffs and the defendant Vadman.

---

[2]The 1967 legislature did as anticipated, and the tract continued to have this potential until December 1967 when another site was selected.

A detailed presentation of the facts is necessary for an adequate understanding of that issue. Many of the facts are stipulated as part of a pretrial order, others are hotly contested, as are some of the inferences drawn by the trial court from the facts.

Vadman was also the accountant for the Mottman Mercantile Company, as well as for some individual members of the Mottman family. We will refer to the corporation and the members of the family collectively as the Mottmans, except where differentiation may be important. Based upon the knowledge Vadman had acquired of the Mottmans, he suggested to the plaintiffs in November or December 1965, that the Mottmans might be willing to accept 1,000,000 dollars for the tract of land here in question. The plaintiffs in March 1966, authorized Vadman to offer $5,000 for a 1-year option to purchase the tract for $1,000,000.[3] It was agreed that Vadman was to receive a 2 per cent finder's fee if he was successful in acquiring the option and if the option was sold or exercised by them within the year. It was understood that the option would be taken in Vadman's name, and that the identity of Moss and Robbins was not to be disclosed to the Mottmans.[4]

This offer was not acceptable to the Mottmans, either as to purchase price or as to the amount to be paid for the option, but because of the interest shown they commissioned Mr. Hubert Hoffman to make a study of the property to determine its value.

The trial court's findings of fact cover quite concisely what followed thereafter.

---

[3]This authorization was in the form of a letter dated March 29, 1966, addressed to Vadman, and signed by the plaintiff Darrell F. Moss, which read as follows:

Please accept this letter as the authority to offer to the Mottman family for their Westside Olympia holdings, as set forth on the accompanying map,

ONE MILLION DOLLARS CASH ($1,000,000.00) to be paid one year from the giving of an option for which we will place on deposit Five Thousand Dollars ($5000.00).

[4]Both the plaintiffs and Vadman were aware that the Mottmans would not be inclined to tie up their property for so long a time with parties of such limited financial means as the plaintiffs.

On July 16, 1966, Mr. George Mottman, Mr. Hoffman and the defendant Vadman met at the store operated by Mottman Mercantile Company and tentatively agreed upon a price of $1,160,000.00[5] for the tract and $60,000.00 for a one year option, and planned for a stockholders meeting later to obtain stockholder approval thereto.

Finding of fact 12.

On July 18, 1966, the defendant Vadman reported to Plaintiffs the price and that Mottman would probably give an option for a year for $60,000.00.

Finding of fact 13.

The defendant Vadman was sick from July 21 to August 7, 1966, and the Mottmans delayed the stockholders' meeting until August 8th so that he could be present. At the meeting on August 8, 1966, the Mottmans orally agreed to give the defendant Vadman an "Option" to the end of August. The defendant Vadman informed Mottmans that he was dealing with some undisclosed interested parties (plaintiffs) and that they were to have until the end of August to raise the $60,000.00. The defendant Vadman told Mottmans that he was also interested, and if the undisclosed parties then interested did not raise the money, he would find others, and it was agreed that he, Vadman, would have an additional day for himself or until September 1, 1966, at 5:00 P.M.

Finding of fact 14.

That on or about August 8, 1966, plaintiffs were informed that they would have to the end of the month (August 31, 1966) to obtain from Vadman an assignment of his option right upon the payment of $60,000.00 for the option and a Finder's Fee of 2%. Later, on the evening of August 31, 1966, on a phone call from the plaintiffs, the defendant Vadman extended the time to 10:00 A.M., September 1, 1966.

Finding of fact 15.

At this point, we interrupt our quotation of the trial court's findings to point out that the finding (No. 14) that Vadman had the day of September 1 for himself is a crucial

---

[5]This was approximately $1,000 an acre.

finding in the case. The plaintiffs at all times have contended that their understanding was that they had until 5 p.m. on September 1, 1966 to raise the $60,000. We, therefore, amplify finding No. 14 by the testimony of the defendant Vadman as to what transpired at the August 8 meeting.

Vadman testified that the Mottmans were pushing for immediate payment of the $60,000 and suggested first 2 days and then 10 days for payment; that he, endeavoring to get more time for the plaintiffs, suggested a month, but that the Mottmans would not agree to an extension beyond the end of the month (August). Vadman then phoned Moss to ask if he and Robbins were interested in those terms, *i.e.*, $60,000 by the end of August. Advised that they were, Vadman went back to the meeting and said, "I will take the option until the end of the month." It was shortly thereafter that he interjected the idea of an extra day for himself into the discussion, saying that if his parties could not raise the $60,000 by the end of August, he would raise it himself.

We accept the trial court's finding based on the substantial though uncorroborated[6] testimony that the plaintiffs were advised they had until the end of August (1966) to raise the $60,000, and that Vadman had an extra day (*i.e.*, until 5 p.m. on September 1, 1966) to raise that amount if the plaintiffs failed.

In their quest for the $60,000, the plaintiffs contacted the Swanson-Whisler group in the latter part of August.

We turn again to the findings as made by the trial court.

On August 24, 1966, the defendant Richard Swanson began dealing with the plaintiffs regarding the option and in what proportions they would contribute and who would have control. After serveral meetings they failed to agree. On August 29, 1966, the defendant Richard Swanson contacted the defendant Vadman and learned that plaintiffs had until the end of August to perform. On

---

[6]Mr. Hubert Hoffman (the only other person present at this meeting with the Mottman family on August 8 who testified at the trial) said that he "felt" September 1 was the deadline. He did not recall anything about the last day being reserved for Vadman.

August 30, 1966, Richard Swanson informed the defendant Vadman that his group would put up option money and pay a finders' fee if plaintiffs did not. On the evening of August 31, 1966, the defendant Vadman told the defendant Richard Swanson that he had given plaintiffs until 9:00 or 10:00 A.M. on September 1, 1966 within which to produce the $60,000.00. On the morning of September 1, 1966, at 10:00 o'clock A.M., plaintiffs had not complied and the defendant Vadman accepted the Swanson-Whisler offer.

Finding of fact 17.

Richard Yeager, of Shelton, Washington, was on the local four-year college committee and was interested in recommending a location for the new college. On August 30, 1966, he talked with plaintiffs about their option and found that it was oral, and concluded the "price" on the property was right, but the terms were poor. Later on August 31, 1966, he called defendant Vadman to verify that he had heard from the plaintiffs, and on the evening of August 31, without further contacting plaintiffs, he decided to put up the money. He talked with some of his acquaintances and on the morning of September 1, 1966, obtained funds from different ones and at about 11:30 A.M. obtained from the Bank a Manager's Check for $60,000.00 and left it with Vadman's secretary to take up the option, although plaintiffs did not know until about noon that day that Yeager had actually concluded to raise the $60,000.00 or that he had attempted to actually put up the money for the option. Further, Yeager made no agreement with Vadman regarding the finder's fee.

Finding of fact 18.

That at a meeting which started at 2:00 P.M. on September 1, 1966, the option was signed by the Mottman Mercantile Company to the defendant Warren Vadman and delivered to him, and later, (July 27, 1967) transferred by him to the defendants Swanson and Whisler when an obligation was given to him evidencing a finder's fee of $25,000.00 less $1100.00 paid for attorney's fee, leaving a balance payable to him of $23,900.00.

Finding of fact 19.

The quoted findings by the trial court and our interpolations in the narrative for purposes of clarification are all supported by substantial evidence.

402

We are satisfied that had the plaintiffs produced the $60,000 required for the option during the month of August 1966, or even during the extension of time given them, the option would have been assigned to them; and that failing to produce the $60,000 by that time, they had no further right to the option and no interest in the property.

It is conceded that the $60,000 could not possibly have been produced by Mr. Yeager until sometime after 11:30 a.m. on September 1, at which time he secured a bank manager's check in that amount. That tender was not within the time limit, and we do not need to determine whether it was actually made on behalf of the plaintiffs or of himself.

The trial court concluded that, on the basis of the facts as found, Vadman was not an agent of the plaintiffs and that there was no fiduciary relationship, and that when the plaintiffs failed to produce $60,000 by the end of August, or within the extension accorded to them, Vadman was at liberty to deal with the Swanson-Whisler group.

With these conclusions we are in accord. If there was an agency between the plaintiffs and Vadman, and we do not believe there was, it was for the limited purpose of presenting the original offer made by the plaintiffs to the Mottmans. When that offer was rejected, the agency, if any, terminated.

After the August 8th meeting (referred to in finding No. 14 previously quoted) Vadman had an option (or more exactly a promise of an option) for sale, and he gave the plaintiffs a specific time and amount within which and for which they might acquire the option.

We have repeatedly held that a prerequisite of an agency is control of the agent by the principal. *McCarty v. King County Medical Serv. Corp.*, 26 Wn.2d 660, 175 P.2d 653 (1946) and cases cited.

We have frequently cited the Restatement of Agency[7] for the proposition that an agency relationship results from the manifestation of consent by one person that another shall

[7]Both the original and Restatement (Second) of Agency § 1 (1958).

act on his behalf and subject to his control, with a correlative manifestation of consent by the other party to act on his behalf and subject to his control. *Matsumura v. Eilert*, 74 Wn.2d 362, 444 P.2d 806 (1968); *Turnbull v. Shelton*, 47 Wn.2d 70, 286 P.2d 676 (1955); *Coombs v. R. D. Bodle Co.*, 33 Wn.2d 280, 205 P.2d 888 (1949); *McCarty v. King County Medical Serv. Corp.*, *supra.* Seavy on Agency states that an agency is a consensual relation between two persons created by law by which a principal has a right to control the conduct of the agent and the agent has a power to affect the legal relations of the principal. W. Seavy on Agency § 3 (1964).

Consent and control are the essential elements of an agency. The relationship is created by law, but if no factual pattern exists which gives rise to an agency, then no agency exists despite the intent of either or both of the parties. Because of this, one may believe that he has created an agency when in fact the relationship is that of seller to buyer. Restatement (Second) of Agency § 1 (1958); *Busk v. Hoard*, 65 Wn.2d 126, 396 P.2d 171 (1964).

Plaintiffs apparently intended to create an agency relationship. To that end they sent Vadman a letter of authority to make an offer for the option on the Mottman tract. This might be interpreted as a manifestation of consent by plaintiffs that Vadman act for them and subject to their control. Vadman, however, had no intent to create an agency. He did not consent to the agency, and more importantly, he did not submit himself to the control of the plaintiffs as to any of his subsequent actions.

The actions of the plaintiffs and Vadman suggest the relationship of buyer and seller as between them, rather than that of principal and agent.

■ The burden of establishing an agency rests upon the one who asserts it. *Walker v. Pacific Mobile Homes, Inc.*, 68 Wn.2d 347, 413 P.2d 3 (1966); *Lamb v. General Associates, Inc.*, 60 Wn.2d 623, 374 P.2d 677 (1962). The plaintiffs did not meet this burden and the trial court's conclusion that there was no agency must stand.

Having found no agency, we need not consider the question of a breach of fiduciary relationship by Vadman, or any participation in that breach by the Swanson-Whisler group or Evergreen Park, Inc.

■ We have not overlooked the second, third and fourth assignments of error which present contentions that a finding of a reservation of September 1 by Vadman for his own purposes was not supported by substantial evidence. The evidence, though coming from a party, was clear and definite. The trier of facts accepted it as true. It has been stated so often as to be elementary that this court will not substitute its view on disputed facts for those of the trier of the facts where its findings are sustained by substantial evidence.

The plaintiffs, as appellants, also contend that the trial court erred in excluding from evidence a letter written by Moss to a former Olympia realtor setting out the terms of the proposed option. The motive for introducing this evidence was to show by its contents that the plaintiffs understood their deadline for tendering the $60,000 to be September 1 rather than August 31.

■ Moss had already testified on direct examination to all of the items set forth in the letter. The trial court did not abuse its discretion in excluding the letter on the grounds that it was cumulative. *Hartman v. Port of Seattle,* 63 Wn.2d 879, 389 P.2d 669 (1964); *Mullin v. Builders Dev. & Fin. Serv., Inc.,* 62 Wn.2d 202, 381 P.2d 970 (1963). In addition, the letter would be properly excludable on the grounds that it was a self-serving declaration. *W. G. Platts, Inc. v. Guess,* 56 Wn.2d 143, 351 P.2d 512 (1960). The case of *Hall v. American Friends Serv. Comm., Inc.,* 74 Wn.2d 467, 445 P.2d 616 (1968), cited by the appellants, is not in point since it dealt with letters written by a decedent to the party offering them and as such they were not self-serving declarations by a party.

Error is also assigned to the trial court's conclusion that the plaintiffs are estopped from asserting any claim against the Swanson-Whisler group and their corporation, Ever-

green Park, Inc. We consider it unnecessary to discuss the issue of estoppel, it being clear that there was no misconduct on the part of the Swanson-Whisler group or their corporation, which made them liable in any way to the plaintiffs.

The judgment appealed from is affirmed.

HUNTER, C. J., WEAVER, HAMILTON, and HALE, JJ., concur.

HILL, J. (dissenting)—I have no disagreement with the majority opinion insofar as it affirms the judgment of the trial court quieting title to the Mottman tract in Evergreen Park, Inc. The plaintiffs failed to establish any basis for imposing a constructive trust on that property. I do disagree with the denial of any recovery against the defendant, Warren Vadman.

I would hold that there was an agency, and a fiduciary relationship between the plaintiffs and Vadman. While it is my view that the evidence preponderates that the plaintiffs were told by Vadman that they had until 5 p.m. on September 1, 1966 to produce the $60,000 and that they had the right to proceed on that assumption, I concede that there is evidence to support the trial court's finding that the plaintiffs had only until the end of August, and that Vadman had reserved for himself the extra day of September 1, 1966.

My dissent is therefore predicated on the proposition that the evidence establishes that there was a limited agency terminating at the end of August 1966, and that until that time Moss and Robbins had the exclusive right as between Vadman and themselves to acquire for $60,000 a year's option to buy the Mottman tract for $1,160,000.

It seems clear to me that the defendant Vadman, who had acted as the agent of the plaintiffs in procuring that right, violated his fiduciary relationship with them when on August 29 he disclosed to the defendant Richard Swanson, representing the Swanson-Whisler group, that if that group could not make a deal with the plaintiffs during August, they could deal with him on September 1. This in effect

ended any chance the plaintiffs had of acquiring financing through the Swanson-Whisler group and made Vadman liable for whatever he received in consequence of his subsequent dealing with the Swanson-Whisler group.

Having stated my position in brief, I shall proceed to a consideration of the evidence, circumstances and authorities which support my position.

Vadman, in addition to his accounting services for the plaintiffs, was their advisor on the feasibility of contemplated real estate transactions. He first broached the subject of the Mottman tract to them by mentioning that it could probably be purchased for $1,000,000. In March 1966, Moss indicated that the partnership might be interested in acquiring an option to purchase the tract at that price. Pursuant to Vadman's suggestion, Moss drew up a letter authorizing Vadman to offer $5,000 for a 1-year option to purchase the property for $1,000,000. (The plaintiffs also agreed to pay Vadman a finder's fee of 2 per cent of the purchase price. This finder's fee was subject to two conditions, *i.e.*, that he acquire the option for them; and that they sell or exercise the option within the year.)

Vadman was asked to present this offer to the Mottmans because he was intimately acquainted with the members of the family in consequence of his position as their accountant, and because the plaintiffs did not want the Mottmans to know from whom the offer was coming.[8] Clearly at this point Vadman was an agent making an offer for undisclosed principals.

It is significant that in the interim between November-December 1965 and March 1966 Vadman never approached the Mottmans for an option on his own behalf and apparently had no desire to secure the option for himself. When he presented the proposition to the Mottmans, they understood that he was representing someone other than himself. His explanation for not disclosing their identity was expressed in these words: "the Mottmans are the type of

---

[8]This was based on their fear that the Mottmans would not deal with them because of their limited financial resources.

people . . . that if they knew the financial standing of the *offerer* they would flatly refuse it." The italicized word shows that Vadman recognized this to be an offer by the plaintiffs. He testified further, "I conversed with Mr. Fritz Mottman in private [before the stockholder meeting] and told him of the receipt of this offer, that I would like to present it to the family." Later, the following exchange took place on direct examination of Vadman. "Q. Now, at that meeting, did you submit to the whole family this proposition contained in Exhibit 1 [the letter of authority from the plaintiffs[9]]? A. Yes, I did." As noted by the majority, this offer was rejected, but on the basis that the Mottmans wanted to investigate further what the price should be and on what terms an option might be given.

The Mottmans met again on August 8, 1966. On the basis of the investigation that had been made, it was decided that the price should be about $1,000 an acre, and so the sale price was fixed at $1,160,000. It was decided also that the price for an option for 1 year should be $60,000.

The length of time for which this offer was to remain open became a subject for discussion. The Mottmans suggested 2 days, then 10 days, and Vadman, knowing the difficulty the plaintiffs might have in raising $60,000, was asking for a month. The Mottmans finally extended the time to the end of August, a matter of some 23 days. Vadman then left the meeting and contacted Moss by telephone to see if he and Robbins would be interested in the option on those terms. Vadman testified that he made clear to Moss that they would have no longer than the end of August and that Moss told him that they wanted the chance to take up this option on those terms. This testimony establishes that Vadman had secured for his principals the right to acquire an option on the Mottmans' property if they could raise $60,000 during the month of August 1967.[10]

---

[9]See note 3 in majority opinion for exact wording.

[10]It should be noted that the plaintiffs contend that the time limit given them was 5 p.m. on September 1. There is evidence supporting

Then Vadman, without realizing it, placed himself in a position whereby it became possible for a conflict of interest to develop between his principals and himself.

Upon returning to the meeting after his phone conversation with Moss, he advised the Mottmans that the terms suggested were acceptable to "my people." Then, being conscious of the very real possibility that his "people" might not be able to raise $60,000 by the end of August, and feeling that he knew sources from which it could be raised, Vadman said to the Mottmans: "Give me an extra day if these people don't come up with it and I will get it myself." His testimony was that the Mottmans agree to give him the extra day, that is, to 5 p.m., September 1.[11]

All of these circumstances up to and through his meeting with the Mottmans on August 8 indicate to me that Vadman considered himself, and that he was in fact, an agent for the plaintiffs. Even the request for an extra day beyond the time which had been granted to his "people," was a recognition that at least to the end of August he had reserved for them the exclusive right to acquire the option. The request for an extra day for himself when granted created a potential, although not a necessary, conflict of interest.

He had, for an agreed consideration, secured for his "people" a valuable option conditioned on their being able to raise $60,000 before the end of August. Consequently, he had an obligation, if not to help his "people" raise that $60,000, at least to do nothing which would hinder them, and thereby make his extra day a reality. That obligation was violated on August 29, under the following circumstances.

Among those from whom the plaintiffs were attempting to secure financial assistance in acquiring the option was the Swanson-Whisler group. Richard Swanson inquired of

this contention, but for the purpose of this dissent I am accepting the facts as found by the trial court; i.e., that Moss and Robbins had until the end of August (extended to 10 a.m. on September 1 by Vadman) in which to get the $60,000 to Vadman.

[11]See note 6 in the majority opinion.

Vadman as to the interest of Moss and Robbins, explaining that his group could not reach any agreement with them. Further inquiry was made as to whether the Swanson-Whisler group could go directly to the Mottmans and not deal with the plaintiffs. I quote Vadman's own version of his answer:

> I said, "No, you have to go through Moss and Robbins if you want it," and when he told me they just couldn't deal with them, I then disclosed to him that I actually held the option, not Moss and Robbins, that I actually held the option, that I had the last day of the option, which expired on September 1st at five o'clock, and that I was at that point in my own mind about ready to go out and start contacting the people I had for backup in case they did not come through with the money.
>
> . . .
>
> He wanted to know if they could take my place on the 1st, or put the money up that I would be looking for on the 1st. I said, "Yes, you could, but if you really want the option you better go through Moss and Robbins, because they have until the 31st, and I can't work with you until the 1st of September, and if they come up with the money they are going to get the option. If you want the property you better work through Moss and Robbins." He indicated that they would sooner take the chance and deal with me on the 1st and lose the option than to deal with Moss and Robbins on it. They then reported back to me a day and a half later, or a day later, that they would cover me for sixty thousand dollars on the 1st of September if Moss and Robbins had not given me the money before that day.

To Vadman's credit, as his testimony indicates, he made an effort to induce the Swanson-Whisler group to work with the plaintiffs; but he also told them the one thing they needed to know to take off any pressure to deal with the plaintiffs, *i.e.,* that if they (the Swanson-Whisler group) did not deal with the plaintiffs, they could deal with Vadman on September 1. Vadman's insistence throughout that he could not dispose of the option until September 1 speaks eloquently of his own recognition of a fiduciary relationship with the plaintiffs until the end of August.

Again, in justice to Vadman, it should be pointed out that

he extended the time for plaintiffs to come up with the $60,000 to 10 a.m. on September 1. The extra time was to no avail. Richard Yeager, with whom the plaintiffs had been negotiating, did produce the $60,000, but not until after 11:30 a.m. on September 1.

It is contended and could well be that Vadman's statement to Richard Swanson actually had no bearing on who ultimately acquired the Mottman tract because the members of the Swanson-Whisler group testified that they would not have reached an agreement with the plaintiffs. However, it is clear that Vadman's disclosure that he had the option and that he could deal with them on September 1 ended any chance of such an agreement.

It is generally recognized that an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency. *Cantwell v. Nunn,* 45 Wash. 536, 88 P. 1023 (1907); *also see* Restatement (Second) of Agency § 387 (1958); 3 Am. Jur. 2d *Agency* § 199 (1962). This is a fiduciary duty which demands the utmost good faith. *Moon v. Phipps,* 67 Wn.2d 948, 411 P.2d 157 (1966); *Mele v. Cerenzie,* 40 Wn.2d 123, 241 P.2d 669 (1952); *Westerbeck v. Cannon,* 5 Wn.2d 106, 104 P.2d 918 (1940). Implicit in this fiduciary duty is the obligation of an agent not to aid competitors of his principal concerning the subject matter of his agency. Restatement (Second) of Agency § 393 (1958); 3 Am. Jur. 2d *Agency* § 222 (1962).

Vadman, by his actions, did aid competitors of his principals. Because of his breach of such duty, Vadman should "disgorge" any profits he made by the transaction. *Nicolai v. Desilets,* 185 Wash. 435, 55 P.2d 604 (1936); *also see* Restatement (Second) of Agency § 403 (1958); 3 Am. Jur. 2d *Agency* § 223 (1962).

It is contended that even if there is an agency, it is unenforceable because it is in violation of the statute of frauds. RCW 19.36.010(5). Reliance is placed on *Carkonen v. Alberts,* 196 Wash. 575, 83 P.2d 899, 135 A.L.R. 209 (1938).

The agreement which RCW 19.36.010 (5) declares void unless in writing is one authorizing an agent or broker to sell or purchase real estate for compensation or commission, but it does not say that the actual authority to sell or purchase must be in writing. *Mele v. Cerenzie, supra; Pedersen v. Jones,* 35 Wn.2d 180, 211 P.2d 705 (1949); *Stewart v. Preston,* 77 Wash. 559, 137 P. 993 (1914). That section of our statute of frauds is aimed at fabricated claims for real estate commissions, and purports only to invalidate an oral agreement for such payment. The statute does not abrogate fiduciary duties, a result which would provide unfaithful fiduciaries a shield under which they could violate their trust. I am satisfied that the statute of frauds has no application in this case.[12]

For reasons of public policy the law does not permit an agent to assume any relationship antagonistic to his duty to his principal. The underlying purpose of this rule is to avoid temptation and to keep the agent singularly concerned with the rights and welfare of his principal. 3 Am. Jur. 2d *Agency* § 220 (1962). Consequently, if an agent receives anything as a result of his violation of a duty of loyalty to the principal, he is subject to a liability to deliver it or its value to the principal. Restatement (Second) of Agency § 403 (1958). I have referred to the law of agency because of my belief that an agency was established which did not terminate until the end of August. However, whether or not there was an agency, Vadman recognized the exclusive right of the plaintiffs to acquire the option during the month of August. The whole transaction is "instinct with an obligation"[13] not to interfere with that right.

---

[12] I have given no consideration to an additional reason suggested for holding the statute of frauds inapplicable, *i.e.,* that the option here in question did not constitute "real estate" within the purview of RCW 19.36.010 (5), the issue not having been discussed or briefed by counsel. There was nothing more substantial in this case than a promise to give an option until after 2 p.m. on September 1, 1966.

[13] Scott, J., in *McCall Co. v. Wright,* 133 App. Div. 62, 68, 117 N.Y.S. 775 (1909), quoted by Cardoza, J. in *Moran v. Standard Oil Co.,* 211 N.Y. 187, 198, 105 N.E. 217 (1914) and in *Wood v. Duff-Gordon,* 222 N.Y. 88, 91, 118 N.E. 214 (1917).

Vadman's disclosure to the Swanson-Whisler group was such an interference, and in my book constituted a breach of a fiduciary relationship, regardless of the legal label that may be placed upon it.

Consequently, I would direct the entry of a money judgment in favor of the plaintiffs against the defendant Vadman in the sum of $25,000, the amount received by him from the Swanson-Whisler group as a result of his transfer of the option to that group.[14]

ROSELLINI, NEILL, and McGOVERN, JJ., concur with HILL, J.

---

March 5, 1970. Petition for rehearing denied.

*Reported in 462 P.2d 912.

---

[14]Although the prayer of the plaintiffs' complaint was for $23,000, the actual finder's fee paid was $25,000, and recovery of that amount is authorized by CR 54(c).