

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| ROYAL CARIBBEAN CRUISES LTD., a Liberian Corporation, | ) ) ) | No. 76275-3-I |
| Appellant, | ) ) ) | DIVISION ONE |
| v. | ) ) ) | |
| SWEDISH HEALTH SERVICES, a Washington Corporation d/b/a SWEDISH MEDICAL CENTER; SEATTLE RADIOLOGISTS, a Professional Corporation; THE POLYCLINIC, a Professional Corporation; FREDERICK A. MANN, M.D.; PEGGY D. HEADSTROM, M.D.; and KYUNG HI HAN, M.D., | ) ) ) ) ) ) ) ) ) ) ) | UNPUBLISHED OPINION |
| Respondents. | ) ) | FILED: October 22, 2018 |

SCHINDLER, J. — In 2009, Jacqueline Almonte filed a lawsuit against Royal Caribbean Cruises Ltd. (RCCL). Almonte alleged RCCL provided inadequate medical care and asserted claims under federal maritime law for unseaworthiness, negligence under the Jones Act, 46 U.S.C. § 30104, and maintenance and cure. In 2014, RCCL settled the lawsuit for $700,000. Almonte released all claims against RCCL and medical care providers. In May 2015, RCCL filed an indemnity and contribution action under federal maritime law and state law against Swedish Health Services, the Polyclinic, Dr. Peggy Headstrom and Dr. Kyung Han, and Seattle Radiologists and Dr.

Frederick Mann. We affirm summary judgment dismissal of the indemnity and contribution lawsuit.

BACKGROUND AND PROCEDURAL HISTORY

Medical Care

Jacqueline Almonte is a Dominican Republic citizen. In 2007, Almonte worked as a crewmember aboard the Royal Caribbean Cruises Ltd. (RCCL) cruise ship *Serenade of the Seas*. In July 2007, Almonte saw the ship doctor for "severe abdominal pain." When the ship docked in Juneau, Alaska, the ship doctor referred Almonte to Valley Medical Care. On August 16, Valley Medical Care diagnosed Almonte with "an acute peptic ulcer" and prescribed medication. After Almonte returned to work aboard the ship, her symptoms got worse. On September 1, a ship doctor examined Almonte and found her "not fit for duty." RCCL case coordinator Tania Arroyo[1] worked in the crew medical department in Miami, Florida. Arroyo made arrangements for Almonte to leave the ship and go to the Sitka Community Hospital Emergency Department. The hospital admitted Almonte on September 3. Dr. Robert Hunter examined Almonte and ordered a CAT[2] scan. According to Dr. Hunter, the CAT scan showed "Crohn's disease with an inflammatory obstruction of the terminal ilium, fistulas and free fluid in the pelvis." Dr. Hunter treated Almonte for Crohn's disease and prescribed steroids. Dr. Hunter discharged Almonte on September 9. In the discharge instructions, Dr. Hunter refers Almonte to gastroenterologist Dr. Peggy Headstrom at the Polyclinic in Seattle

---

[1] Tania Arroyo subsequently changed her name to Tania Rivera. For clarity, we refer to her as Tania Arroyo throughout this opinion.

[2] Computerized axial tomography.

and directs Almonte to call the Polyclinic on September 10 to make an appointment. RCCL paid for Almonte to fly to Seattle and stay in a hotel.

At the request of RCCL, on September 10, 2007, AXA Assistance USA faxed the Sitka Community Hospital discharge summary and a "letter of Guarantee of Payment" to the "Poly Clinic — Dr. Peggy Headstrom." The September 10 AXA "Letter of Confirmation of Benefits Medical Services" confirmed coverage for Almonte and reimbursement for reasonable charges as "approved by AXA Assistance USA."

> Your facility will be reimbursed reasonable and customary charges as determined by geographic location or by prearranged contractual assignments for emergency treatment which is medically necessary and approved by AXA Assistance USA. **Coverage is subject to all terms, conditions, limitations and exclusions of the patient's policy.**[3]

Dr. Headstrom examined Almonte on September 10. Dr. Headstrom notes:

> The report I have from that [Sitka] hospitalization is not detailed. Apparently she did have a CAT scan that showed some ileal abnormalities, and she was placed on prednisone and Asacol for the last several days. I do not know the results of any other laboratory testing.

Almonte was admitted to Swedish Medical Center for diagnostic testing. Dr. Headstrom ordered a "CAT scan with CT[4] enteropathy" and a colonoscopy. Dr. Frederick Mann of Seattle Radiologists reviewed the CT scan and found it was "[n]egative" for gastrointestinal disease. On September 12, Polyclinic physician Dr. Kyung Han performed the colonoscopy. The results were "normal."

Swedish Medical Center physician Dr. Mark Kohmetscher discharged Almonte on September 13. The discharge states the "CAT scan with CT enteropathy [is] essentially negative. No evidence of that described from films done in Sitka, Alaska."

---

[3] Emphasis in original.

[4] Computed tomography.

The discharge diagnosis is "possible gastroparesis, still with some pending workup." Dr. Kohmetscher prescribed medication and noted Almonte is "planning to emigrate back to the Dominican Republic." Dr. Kohmetscher suggests Almonte "follow up [with] Dr. Headstrom Monday to look at finalized biopsy results."

Almonte saw Dr. Headstrom on September 17 for a follow-up appointment. Almonte told Dr. Headstrom she was "able to eat" and still had "some lower abdominal discomfort, but nothing severe." Dr. Headstrom wrote Almonte "a note saying she is okay to go back to the ship." Dr. Headstrom also gave Almonte "some of her records from her recent hospitalization to take with her back to the Dominican Republic."

The first time Almonte spoke to RCCL case coordinator Arroyo was after Almonte saw Dr. Headstrom on September 17. Almonte told Arroyo she had the "same symptoms." On September 18, Arroyo decided to send Almonte home.

> [C]rew will be sent home she still has pain and no clear diagnosis was given apparently the CT[ ]scan and the colonoscopy came back negative she still suffers from pain and is worried to return to the ship in this condition so I will send her home for a further investigations [sic].

On September 19, Arroyo requested the Polyclinic and Dr. Headstrom provide "all med[ical] report & letter saying [patient] is fit to go back to work." The Polyclinic refused to disclose patient information without Almonte's consent.

Almonte flew home to the Dominican Republic on September 20. On September 21, Almonte was admitted to a clinic. The clinic performed surgery to drain an abscess and remove her perforated appendix. The attending physician diagnosed and treated Almonte for Crohn's disease.

4

2009 Florida Lawsuit

On November 16, 2009, Almonte filed a lawsuit against RCCL in Miami-Dade County circuit court. Almonte alleged RCCL did not provide adequate medical care. Almonte alleged she did not receive adequate medical care from the ship's doctors or the "shoreside doctors." Almonte alleged RCCL "willfully and callously delayed, failed and refused to provide Plaintiff's entire maintenance and cure" when it sent her home without any type of assistance. Almonte alleged the lack of "reasonably fit medical staff" and facilities onboard made the ship unseaworthy. Almonte asserted federal maritime claims for unseaworthiness, negligence under the Jones Act, 46 U.S.C. § 30104, and maintenance and cure.

Almonte alleged she "kept returning" to the ship doctor "as her pain increased." The ship doctor diagnosed her with "peptic ulcer disease," gave her medication, and she returned to work. The complaint alleged that under the Jones Act, RCCL was liable for the failure of "its chosen doctors and agents" to properly diagnose and treat Almonte. The complaint alleged that under maritime law, RCCL was responsible to ensure prompt and adequate medical treatment. Almonte alleged RCCL breached its duty and she suffered injury as a result of the negligence of RCCL "and/or its agents, servants, and/or employees." RCCL filed an answer. RCCL denied the allegation that it chose the onshore doctors or that they were the agents of RCCL.

Almonte did not file a federal maritime claim against the Seattle health care providers for negligent care or treatment. To invoke admiralty jurisdiction over a tort claim against the health care providers, Almonte had to show the tort occurred on navigable water or an injury suffered on land was caused by a vessel on navigable

5

water. Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 534, 115 S. Ct. 1043, 130 L. Ed. 2d 1024 (1995). The inquiry under the connection test is whether the allegedly tortious activity "is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand." Grubart, 513 U.S. at 539-40.

### November 2013 Letter

On November 25, 2013, RCCL sent a "Notice and Tender of Defense and Demand for Indemnity" to Seattle Radiologists and Dr. Mann. Seattle Radiologists and Dr. Mann denied tender of defense because the three-year statute of limitations barred state law claims for medical malpractice in 2007.

### 2014 Settlement and Release

In June 2014, RCCL settled the federal maritime lawsuit Almonte filed in Florida for $700,000. In exchange, Almonte signed a release of all claims against RCCL and all medical care providers.

### 2015 Indemnity and Contribution Lawsuit

On May 27, 2015, RCCL filed a lawsuit in King County Superior Court against Swedish Health Services, Seattle Radiologists, the Polyclinic, Dr. Frederick Mann, Dr. Peggy Headstrom, and Dr. Kyung Han (collectively, health care providers) for equitable contribution and indemnity under federal maritime law and breach of an implied maritime contractual claim. In the alternative, RCCL asserted claims for contribution and indemnity under state law. The health care providers filed answers and asserted a number of affirmative defenses, including the statute of limitations.

Motion for Partial Summary Judgment on Indemnity and Contribution Claims

The health care providers filed motions for summary judgment dismissal of the federal maritime and state law claims for indemnity and contribution. The health care providers argued RCCL could not meet the test under Grubart to invoke admiralty tort jurisdiction and the undisputed evidence did not establish breach of an implied maritime contract. The health care providers argued the court should dismiss the state law claim for contribution because there was no "agency relationship" under Washington law.

In opposition, RCCL argued it did not seek equitable indemnity and contribution for a tort claim against the health care providers. RCCL argued the equitable contribution and indemnity claim is governed by the underlying Jones Act negligence claim asserted in the Florida lawsuit.

> [T]he underlying claim giving rise to the indemnity action was maritime—here Almonte's claims against RCCL for Jones Act negligence and unseaworthiness—rather than the facts of Defendants' own negligence as if this were a direct malpractice claim.

RCCL argued the evidence supported breach of an implied warranty because RCCL "has been sending crewmembers to The Polyclinic and Swedish" and paying for treatment "for more than 15 years." RCCL argued whether the health care providers were the agents of RCCL under state law was a disputed question of fact.

The court granted the motion for partial summary judgment dismissal of "Federal Admiralty Tort Claims for Breach of Implied Contractual Indemnity, Breach of the Implied Warranty of Workmanlike Performance, Equitable Indemnity and Contribution, and State Law Statutory Claim for Contribution." The court issued a 15-page order. The court ruled RCCL could not establish the test under Grubart for admiralty tort jurisdiction. However, the court ruled that "[e]ven assuming maritime law were to

7

apply," the undisputed evidence did not support finding RCCL was entitled to indemnity or contribution under federal maritime law. The court rejected the maritime claim for breach of an implied contract.

> In this case, based on the uncontroverted facts in this record, the court finds that there is insufficient evidence upon which a trier of fact could find a "special relationship" between plaintiff RCCL and any of these defendants to invoke implied contractual indemnity or indemnity based on breach of workmanlike warranty.
>
> In California Home Brands, Inc. v. Ferreira, 871 F.2d 830[, 836] (9th Cir. 1998),[5] the Ninth Circuit Court of Appeals explained the reasoning behind the implied warranty of workmanlike performance, and observed "that [']a covenant of workmanlike performance will not be implied in favor of a shipowner unless there is a relationship between the tortfeasor[ ] and the shipowner in the context of shipping that makes the implication reasonable.[' ]" This approach was adopted by the courts in SeaRiver[6] and Maritime Overseas[7] where they found that this relationship existed based on selection of providers and direct contact between the parties which supported an implied contract. In SeaRiver, the court found past dealings evidencing an understanding between the parties. In Maritime Overseas, the court found that each element of contract had been proven following the ship's specific choice of medical facilities. Here, RCCL has not provided evidence upon which a trier of fact could find such a relationship with these defendants.
>
> The record in this case, in contrast to that in SeaRiver and other cases relied upon by RCCL, do not demonstrate that RCCL selected the medical providers in this case or that the parties had an understanding based upon past dealings that would effectuate a contract. Although the Declaration of Ms. Arroyo attempts to establish an ongoing relationship with some of these defendants (Swedish Medical Center, Polyclinic) based on past referral of crewmembers, it does not create a genuine issue of material fact to prove "an understanding, based on their relationship and past dealings, that [the shipowner] would send its injured employees to [these treating providers], and that in return, [these treating providers] would provide competent medical treatment to those employees." SeaRiver[,] 983 F. Supp. [at] 1298.

---

[5] Quoting Flunker v. United States, 528 F.2d 239, 243 (9th Cir. 1975).

[6] SeaRiver Mar., Inc. v. Indus. Med. Servs., Inc., 983 F. Supp. 1287 (N.D. Cal. 1997).

[7] Mar. Overseas Corp. v. United States, 433 F. Supp. 419 (N.D. Cal. 1977).

The court states the contribution claim under RCW 4.22.040 "is only available if RCCL paid as a principal on behalf of its agent[s]."[8] The court found the undisputed facts established the health care providers were not employed by RCCL, RCCL did not choose to send Almonte to Dr. Headstrom, and "all RCCL actually did was authorize payment." The court concluded a "reasonable trier of fact could find neither consent nor control." The court reserved ruling on the other state law claims "for equitable contribution and/or indemnity under Washington law."

<u>Motion for Summary Judgment Dismissal of State Claims</u>

The health care providers filed summary judgment motions to dismiss the state law claims for equitable contribution, equitable indemnity, equitable subrogation, and unjust enrichment. The court granted the summary judgment motions and dismissed the claims. The court ruled the doctrine of equitable contribution under <u>Mutual of Enumclaw Insurance Co. v. USF Insurance Co.</u>, 164 Wn.2d 411, 191 P.3d 866 (2008), did not apply. Because RCCL "steps in the shoes" of Almonte and her medical malpractice claims are "barred by the [three-year] statute of limitations," and because there is no evidence of bad faith, the court dismissed the equitable subrogation claim and concluded equitable tolling did not apply. The court dismissed the claim for unjust enrichment because the statute of limitations had run on any claim for medical malpractice that Almonte had against the physicians.

The court dismissed the equitable indemnity claim against Swedish Health Services, Seattle Radiologists, and Dr. Mann because there is "no genuine issue of material fact that there was any representation made which was relied upon by RCCL

---

[8] Alteration in original.

9

and a duty created." However, the court reserved ruling on the equitable indemnity claim against the Polyclinic and Dr. Headstrom until after the parties deposed RCCL case coordinator Arroyo because "there is a question of what duty is owed by those defendants to RCCL."

In the deposition, Arroyo testified that she did not communicate directly with the Polyclinic or Dr. Headstrom. Arroyo said she "did not have a diagnosis from Doctor Headstrom" when she decided to send Almonte home. In a September 18, 2007 e-mail Arroyo sent to RCCL, she states:

> I will be calling Dr[.] Headstrom in getting information as there is still no diagnosis and no treatment plan the "she can go back to the ship" is very brief no actual ["]she can return to her job duties["] or ["fit for duty"] on that form. No Colonoscopy result was added on there as well.

> This needs to be cleared . . . . [S]he is still not well and will not be able to remain there so she will be sent home for further treatment.

Arroyo was not "able to make contact with Doctor Headstrom." Swedish Medical Center sent Arroyo Almonte's medical records on September 25. Arroyo testified that September 25 was "the first time that [she] received clinical records about Ms. Almonte's care in Seattle."

The court granted summary judgment dismissal of the equitable indemnity claim against the Polyclinic and Dr. Headstrom. The court concluded the undisputed testimony showed RCCL "had no communications with Polyclinic and/or Dr. Headstrom," RCCL "received no information directly from Polyclinic at all," and the first time RCCL received medical records from the Polyclinic was five days after Almonte left to return to the Dominican Republic. The court found the "only information" RCCL received was a note "saying that [Almonte] could return to the ship," and the note was

10

"provided by the patient, . . . not by Polyclinic or by [Dr.] Headstrom." The court ruled as a matter of law "no equitable indemnity claim can lie under the facts of [this] case" and no evidence shows "a duty between the medical professionals and RCCL."

APPEAL OF SUMMARY JUDGMENT DISMISSAL OF FEDERAL AND STATE CLAIMS

RCCL contends the court erred in dismissing the federal maritime law claim for equitable indemnity and contribution, the federal maritime claim for breach of an implied contract, and the alternative state law claims for contribution and indemnity, equitable subrogation, and unjust enrichment.

We review summary judgment de novo. Hartley v. State, 103 Wn .2d 768, 774, 698 P.2d 77 (1985). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). This court engages in the same inquiry as the trial court, viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party. Owen v. Burlington N. Santa Fe R.R., 153 Wn.2d 780, 787, 108 P.3d 1220 (2005). The defendant on summary judgment has the burden of showing the absence of evidence to support the plaintiff's case. Young v. Key Pharms., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989). Once the moving party shows an absence of a genuine issue of material fact, the burden shifts to the nonmoving party. Young, 112 Wn.2d at 225.

While we construe the evidence and reasonable inferences in the light most favorable to the nonmoving party, if the nonmoving party " 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' " summary judgment is proper. Young, 112 Wn.2d at 225 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.

Ct. 2548, 91 L. Ed. 2d 265 (1986)); Jones v. Allstate Ins. Co., 146 Wn.2d 291, 300-01, 45 P.3d 1068 (2002). "[M]ere allegations, denials, opinions, or conclusory statements" do not establish a genuine issue of material fact. Int'l Ultimate, Inc. v. St. Paul Fire & Marine Ins. Co., 122 Wn. App. 736, 744, 87 P.3d 774 (2004).

Questions of fact may be determined as a matter of law " 'when reasonable minds could reach but one conclusion.' " Owen, 153 Wn.2d at 788 (quoting Hartley, 103 Wn.2d at 775). "[A]n appellate court may affirm a grant of summary judgment on an issue not decided by the trial court provided that it is supported by the record and is within the pleadings and proof." Plein v. Lackey, 149 Wn.2d 214, 222, 67 P.3d 1061 (2003).

FEDERAL MARITIME CLAIMS

State courts have concurrent jurisdiction to adjudicate maritime cases under the "saving to suitors" clause of the United States Constitution. 28 U.S.C. § 1333(1);[9] U.S. CONST. art. III, § 2, cl. 1; Dean v. Fishing Co. of Alaska, 177 Wn.2d 399, 405, 300 P.3d 815 (2013); Endicott v. Icicle Seafoods, Inc., 167 Wn.2d 873, 878-79, 224 P.3d 761 (2010). Federal maritime law governs maritime actions brought in state court. Endicott, 167 Wn.2d at 878-79.

1. Federal Maritime Equitable Indemnity and Contribution Claim

RCCL does not contest there is no jurisdiction over a federal maritime tort claim under Grubart. RCCL contends it is entitled to equitable indemnity and contribution for

---

[9] 28 U.S.C. § 1333(1) provides, "The district courts shall have original jurisdiction, exclusive of the courts of the States, of . . . [a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." The Admiralty Extension Act, 46 U.S.C. § 30101, states, in pertinent part, "The admiralty and maritime jurisdiction of the United States extends to and includes cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land." 46 U.S.C. § 30101(a).

the Jones Act negligence claim asserted in the Florida maritime lawsuit. The undisputed record establishes Almonte did not assert a tort claim in the Florida lawsuit. Almonte alleged federal maritime claims for unseaworthiness, negligence under the Jones Act, and maintenance and cure.

The federal maritime doctrine of maintenance and cure imposes a nonwaivable and nondelegable duty on a shipowner to provide food, lodging, and medical treatment to a seaman injured in the course of employment. See De Zon v. Am. President Lines, Ltd., 318 U.S. 660, 667, 63 S. Ct. 814, 87 L. Ed. 1065 (1943). A seaman has the right to recover damages for injuries sustained due to the unseaworthiness of the ship. The Osceola, 189 U.S. 158, 175, 23 S. Ct. 483, 47 L. Ed. 760 (1903).

Congress passed the Jones Act in 1920[10] to create a negligence cause of action for ship crewmembers against their employers. Cal. Home Brands, 871 F.2d at 833; Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 133-34, 76 S. Ct. 232, 100 L. Ed. 133 (1956). The Jones Act creates "a negligence cause of action only against the employer." Cal. Home Brands, 871 F.2d at 833.[11] A sick seaman has a cause of action under the Jones Act for the shipowner's wrongful failure to provide proper medical care. De Zon, 318 U.S. at 667-69. Congress extended to ship workers the rights granted to railroad employees by the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51. Cox v. Roth, 348 U.S. 207, 208, 75 S. Ct. 242, 99 L. Ed. 260 (1955). Under FELA, an employer is " 'liable for the injuries negligently inflicted on its employees by its officers, agents, or employees.' " Craig v. Atl. Richfield Co., 19 F.3d

---

[10] LAW OF June 5, 1920, ch. 250, § 33, 41 STAT. 1007 (codified as former 46 U.S.C. § 688).
[11] Emphasis in original.

472, 477-78 (9th Cir. 1994)[12] (quoting Hopson v. Texaco Inc., 383 U.S. 262, 263, 86 S. Ct. 765, 15 L. Ed. 2d 740 (1966)).

To recover under the Jones Act, the seaman must establish by a preponderance of the evidence (1) negligence on the part of his employer, or agents thereof, and (2) that the negligence was a cause, "however slight," of his injuries. Havens v. F/T Polar Mist, 996 F.2d 215, 218 (9th Cir.1993).

Whether RCCL is entitled to equitable indemnity and contribution for settlement of the Jones Act negligence claim turns on whether the Seattle health care providers were acting as the agents of RCCL. A shipowner is liable for the negligence of an onshore doctor "when the shipowner selects a doctor who acts negligently." Olsen v. Am. S.S. Co., 176 F.3d 891, 896 (6th Cir. 1999); see also Cent. Gulf S.S. Corp. v. Sambula, 405 F.2d 291, 299-302 (5th Cir. 1968) (treating onshore physician was ship's agent because the shipowner, not the crewmember, selected him); Mar. Overseas Corp., 433 F. Supp. at 421 (doctor hired by shipowner is agent of the shipowner "and the shipowner is liable for the malpractice of the doctor"); Fitzgerald v. A.L. Burbank & Co., 451 F.2d 670, 680 (2d Cir. 1971) (physician was ship's agent where he provided medical services under contract for the shipowner).

The undisputed record shows RCCL did not "choose" or select the Seattle health care providers. The record does not establish an agency relationship under the Jones Act between RCCL and the Seattle health care providers. When Sitka Community Hospital physician Dr. Robert Hunter discharged Almonte on September 9, 2007, he referred Almonte to Dr. Peggy Headstrom at the Polyclinic in Seattle. Dr. Headstrom

---

[12] Internal quotation marks omitted.

admitted Almonte to Swedish Medical Center and ordered diagnostic testing and a colonoscopy. RCCL case coordinator Arroyo had no direct contact with Dr. Headstrom or the other Seattle health care providers.

The declaration Arroyo submitted that states she "coordinate[d] Almonte's treatment in Seattle" by arranging Almonte's "transportation, lodging, appointments, payment of medical expenses and follow-up care" does not create a material issue of fact. Arroyo did not testify that RCCL engaged or selected Dr. Headstrom or the other Seattle health care providers to treat Almonte. Although Arroyo testified that she "closely reviewed Almonte's medical records," the record shows the first time Arroyo had access to the medical records was five days after Almonte flew to the Dominican Republic.

The September 10 Letter of Confirmation of Benefits Medical Services and payment for medical care does not show an agency relationship. RCCL had an absolute duty under the doctrine of maintenance and cure to pay medical expenses. Because there is no agency relationship between the parties under the Jones Act, we affirm the summary judgment dismissal of RCCL's federal maritime claim for equitable indemnity and contribution.

2. Federal Maritime Implied Contractual Indemnity Claim

In Ryan, the United States Supreme Court held there is an implied warranty of workmanlike performance in every contract between a maritime contractor and a shipowner. Ryan, 350 U.S. at 133-34. "The warranty of workmanlike performance is intended to ease the burden of absolute liability by permitting a shipowner to recover

against a contracting party whose poor workmanship created the dangerous condition." Cal. Home Brands, 871 F.2d at 836.[13]

In Waterman Steamship Corp. v. Dugan & McNamara, Inc., 364 U.S. 421, 81 S. Ct. 200, 5 L. Ed. 2d 169 (1960), the Supreme Court extended Ryan indemnity to situations where there was no express contractual relationship. A shipowner can be held vicariously liable under the doctrine of unseaworthiness for the acts of third parties that cause injury to a seaman. Flunker, 528 F.2d at 242. In Joiner v. Diamond M Drilling Co., 677 F.2d 1035, 1038 (5th Cir. 1982), the Fifth Circuit held absent a special relationship, Ryan indemnity does not apply to a "private land-locked physician."

> A private land-locked physician who treats a patient who happens to have been injured at sea, does not thereby enter into an implied maritime contract. We can find absolutely no support for the proposition that an ordinary, private, onshore physician who treats an injured sailor has thereby submitted himself to the rules of maritime commerce. Rather, it has been consistently held that it is state law which controls in cases such as this.

Joiner, 677 F.2d at 1038.[14]

RCCL contends there is a genuine issue of material fact as to whether RCCL had a special relationship with the Seattle health care providers. RCCL cites Maritime Overseas, 433 F. Supp. 419, and SeaRiver, 983 F. Supp. 1287. In Maritime Overseas, the shipmaster contacted the government hospital in Japan to treat a crewmember and agreed to pay for care. Mar. Overseas, 433 F. Supp. at 420. The shipowner filed an indemnity action for breach of an implied contract. Mar. Overseas, 433 F. Supp. at 421. Because the shipmaster selected the hospital and requested treatment in exchange for payment, the court held the hospital was liable for breach of an implied contract. Mar.

---

[13] Emphasis in original.
[14] Emphasis in original.

Overseas, 433 F. Supp. at 422. In SeaRiver, the court held there was an implied contractual relationship because the shipowner "regularly referred its employees in need of medical treatment to [the clinic]" for 8 to 10 years. SeaRiver, 983 F. Supp. at 1298-99, 1291. The court concluded the parties "developed an understanding, based on their relationship and past dealings, that [the shipowner] would send its injured employees to [the clinic], and that in return, [the clinic] would provide competent medical treatment to those employees." SeaRiver, 983 F. Supp. at 1298.

The evidence that RCCL has paid Swedish and the Polyclinic for 15 years to treat crewmembers does not create a material fact. Absent any evidence that the payments were made as the result of a referral by RCCL, the payments alone do not establish an implied contract. On this record, a reasonable trier of fact could only conclude there was no special relationship between the parties. We conclude the court did not err by dismissing the implied contractual indemnity under federal maritime law.

STATE LAW CLAIMS

1. RCW 4.22.040 and RCW 4.22.070

RCW 4.22.040 establishes a right of contribution between joint and severally liable parties. RCW 4.22.070(1)(a) allows joint and several liability where "the negligent parties were acting in concert or where there was a master/servant or principal/agent relationship at play." Kottler v. State, 136 Wn.2d 437, 446, 963 P.2d 834 (1998).

Under Washington law, "an agency relationship results from the manifestation of consent by one person that another shall act on his behalf and subject to his control, with a correlative manifestation of consent by the other party to act on his behalf and subject to his control." Moss v. Vadman, 77 Wn.2d 396, 402-03, 463 P.2d 159 (1969).

17

A prerequisite of agency is " 'control of the agent by the principal.' " Bain v. Metro. Mortg. Grp., Inc., 175 Wn.2d 83, 107, 285 P.3d 34 (2012)[15] (quoting Moss, 77 Wn.2d at 402). RCCL has the burden of establishing agency. Moss, 77 Wn.2d at 403. The existence of a principal-agent relationship is a question of fact unless the facts are undisputed or reasonable minds could reach only one conclusion. O'Brien v. Hafer, 122 Wn. App. 279, 284, 93 P.3d 930 (2004).

RCCL argues the declaration of Arroyo creates a genuine issue of material of fact whether RCCL and the health care providers had an agency relationship under Washington law. Arroyo testified that she "worked with RCCL's agents in Sitka and Seattle to coordinate Almonte's treatment in Seattle, including her transportation, lodging, appointments, payment of medical expenses and follow-up care."

The undisputed facts show RCCL did not refer Almonte to the Seattle health care providers. Nothing in the record shows that the health care providers consented to act as RCCL's agent or that RCCL exercised any control over the treatment of Almonte by the Seattle health care providers. The record shows that RCCL "doesn't have internal operating procedures or policies dictating how medical care should be provided." RCCL leaves medical care decisions "up to the doctors" and the doctors "make the determinations as to the appropriate care and treatment to provide to a crew member that they're treating as a patient." Arroyo testified that she had no "direct communication with Doctor Peggy Headstrom." Arroyo testified that she did not "receive any direct medical information from the Polyclinic about Ms. Almonte." The court did not err by dismissing the claim for contribution under RCW 4.22.040 and .070.

---

[15] Emphasis in original.

## 2. Equitable Contribution Claim

RCCL contends the court erred by ruling it is not entitled to equitable contribution under Mutual of Enumclaw, 164 Wn.2d 411. In the context of insurance law, "equitable contribution is a right of one insurer to collect from another insurer on a loss that both insurers are concurrently obligated to cover." Mut. of Enumclaw, 164 Wn.2d at 423.[16] In Mutual of Enumclaw, the Washington Supreme Court expressly notes the doctrine does not apply to joint tortfeasors. Mut. of Enumclaw, 164 Wn.2d at 417 n.1 (Contribution and subrogation in the insurance context differ "markedly from traditional notions of these concepts in tort law or even in contract law. We do not intend this opinion to affect general tort or contract law."). None of the cases RCCL cites address equitable contribution between tortfeasors. The court did not err by dismissing the claim for equitable contribution.

## 3. Equitable Indemnity

RCCL claims the court erred in ruling RCCL did not establish a right to equitable indemnity.[17] An equitable indemnity right exists if there is a legal duty between RCCL and the Seattle health care providers. Sabey v. Howard Johnson & Co., 101 Wn. App. 575, 592, 5 P.3d 730 (2000). Legal duty is a question of law which the court reviews de novo. Webb v. Neuroeduc. Inc., P.C., 121 Wn. App. 336, 346, 88 P.3d 417 (2004).

Here, unlike in Sabey, the record shows the health care providers did not owe a duty to RCCL. Contrary to the assertion of RCCL, the note Dr. Headstrom gave to

---

[16] Emphasis in original.

[17] For the first time on appeal, RCCL cites Nelson v. Sponberg, 51 Wn.2d 371, 374-75, 318 P.2d 951 (1957), to argue equitable indemnity does not require a legal duty. RCCL did not raise this argument below. See RAP 9.12 (on review of order granting summary judgment, "appellate court will consider only evidence and issues called to the attention of the trial court").

Almonte that cleared her to return to the ship does not create a duty to RCCL under chapter 7.70 RCW. The court did not err in dismissing the claim for equitable indemnity.

4. Equitable Subrogation

Equitable subrogation "allows one party to step into the shoes of a second party who is owed a debt or obligation and to receive the benefit of that debt or obligation, in the absence of any contractual agreement or assignment of rights between those two parties or the debtor." Columbia Cmty. Bank v. Newman Park, LLC, 177 Wn.2d 566, 573, 304 P.3d 472 (2013). But equity will enforce rights only if the action is brought within the time in which an action could have been brought to enforce the original obligation. Newcomer v. Masini, 45 Wn. App. 284, 286, 724 P.2d 1122 (1986). The three-year statute of limitations bars the equitable subrogation claim.

RCCL cites Ellis v. Barto, 82 Wn. App. 454, 918 P.2d 540 (1996). Ellis holds that "if a claim is substantively based upon the law of another state, the limitation period of that state applies." Ellis, 82 Wn. App. at 457-58. But RCCL's equitable subrogation claim is under Washington law, not Florida law.

In the alternative, RCCL contends equitable tolling applies to its claim for equitable subrogation. "The predicates for equitable tolling are bad faith, deception, or false assurances by the defendant and the exercise of diligence by the plaintiff." Millay v. Cam, 135 Wn.2d 193, 206, 955 P.2d 791 (1998). RCCL does not argue that the health care providers acted in bad faith or made false assurances, nor does the record support such a conclusion.

We conclude the court did not err by granting summary judgment dismissal of RCCL's claim for equitable subrogation.

20

5. Unjust Enrichment

To state a claim for unjust enrichment, the plaintiff must show (1) the defendant received a benefit, (2) the benefit received is at plaintiff's expense, and (3) the circumstances make it "unjust for the defendant to retain the benefit without payment." Young v. Young, 164 Wn.2d 477, 484-85, 191 P.3d 1258 (2008). RCCL contends the 2014 settlement and release conferred a benefit on the health care providers. Because Almonte's claim against the health care providers was barred by the statute of limitations when the parties entered the settlement and release, the court did not err in dismissing the claim for unjust enrichment.

We affirm summary judgment dismissal of the claims under federal maritime law and state law.

WE CONCUR:

21